STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. EUGENE FRANKLIN, DEFENDANT-APPELLANT.

Argued December 5, 1967—Decided July 16, 1968.

*Mr. Matthew P. Boylan,* assigned counsel, argued the cause for appellant.

*Mr. Barry H. Evenchick,* Assistant County Prosecutor, argued the cause for respondent (*Mr. Brendan T. Byrne,* Essex County Prosecutor, attorney).

The opinion of the court was delivered by

GOLDMANN, J. (temporarily assigned). Defendant was convicted of murder in the first degree and sentenced to life imprisonment upon the jury's recommendation. He appealed, advancing several grounds for reversal. In *State v. Franklin,* 49 *N. J.* 286 (1967), we considered only the argument that the trial judge erred in failing to compel Carrie Pitts, the State's principal witness, to submit to a psychiatric examination which might have indicated that her mental condition was such as would have provided a basis for challenging her competency as a witness.

Defendant had prior to trial obtained an order appointing a psychiatrist, Dr. Kesselman, to examine Miss Pitts and determine her competence to testify. When she refused to

submit to such an examination, defense counsel unsuccess-
fully moved for an order compelling her to do so. In order
to have a complete record, we directed that she submit to
the examination and that Dr. Kesselman's testimony then
be taken before the trial judge. Upon consideration of that
testimony and any additional evidence that might be offered
by the parties, the judge was to rule on Miss Pitts' com-
petency and, if he found her competent, state whether the
evidence adduced could have changed the result of the trial.
We remanded the matter for that purpose, directing that
the additional record, together with the trial judge's ruling,
be returned to this court, the parties to file supplemental
briefs addressed to his ruling. We retained jurisdiction.

Carrie Pitts duly submitted to the psychiatric examina-
tion. As ordered in our remand, the trial judge conducted a
hearing at which Dr. Kesselman testified, as did defendant.
The doctor's diagnosis was, "Personality pattern disturbance,
emotionally unstable personality with alcoholic tendencies
(in remission)." In his opinion Miss Pitts was, at the time
of the alleged offense as well as at the time she testified, able
to understand the nature and quality of her behavior, knew
and was able to differentiate right from wrong, and was
competent to testify as a witness. At the close of the testi-
mony the trial judge stated:

"I am satisfied, gentlemen, when Carrie Pitts was offered as a
witness in this trial that she was competent to testify, and I am
satisfied now that she was competent to testify, and I am satisfied,
further, that any testimony that has been adduced here today would
not have resulted in a change in the outcome of the trial."

The supplemental record and briefs having been filed, we
now address ourselves to the arguments initially advanced
and not resolved in our earlier opinion. Defendant contends
that (1) the admission into evidence of the signed statement
he gave the police violated due process; (2) the trial judge
abused discretion when he refused to hear his testimony, out-
side the presence of the jury, as to the voluntariness of that

statement; (3) he erred in restricting cross-examination of Miss Pitts on the question of her chronic alcoholism, and (4) he improperly denied the defense motion for judgment of acquittal.

I

Shortly after 6:30 A.M. on May 19, 1965 Gary Bruce Smith was found dead in a parking lot in the vicinity of Mulberry, East Kinney and Orchard Streets, Newark. The immediate cause of death was a stab wound through the heart. Post-mortem examination revealed that Smith had also been stabbed in the back and chest; there were cuts on his chest and arms and lacerated wounds and abrasions on his head. Close by the body was the victim's parked car, and scattered in the vicinity were his car keys, a nickel, a fountain pen and a pair of eyeglasses. Smith's shirt had been torn and the left front and right rear trousers pocket ripped out. Found on the scene were three large sticks, two of which tested positive for blood of the victim's type. The police found no trace of Smith's wallet.

Defendant was arrested as a material witness at about 1 A.M., Sunday, May 23. At headquarters he told the arresting officers that Carrie Pitts was involved in the homicide and gave them her address. After that address had been checked out defendant was photographed, fingerprinted and admitted to the headquarters cellblock. The police observed that he had a scar over his left eye.

Defendant remained in custody at police headquarters from May 23 until his preliminary examination in municipal court shortly after noon on May 26. Several detectives questioned him on a number of occasions during that period. On Tuesday morning, May 25 defendant signed a statement admitting his participation in the incident resulting in Smith's death.

Since Miss Pitts was chief witness for the State and her credibility under attack by defendant, we detail her testimony at some length, particularly with reference to the

drinking she did on the evening in question. She had known defendant for almost a year. Although described as his "girlfriend," their relation was not so innocent a one; it appears he was her procurer. Both were Negroes.

On May 18 Miss Pitts left work in South Plainfield to visit defendant in Newark. She testified she met him at his home, 131 Lincoln Street, at 6 P. M., had dinner there, and then visited several bars with him. At about 12:30 A. M. she left him at the Dreamland Bar on Mulberry Street and went to the B & M Bar nearby, where she met Smith, a white man, as she was going into the place. They had "a few drinks" there. Defendant came in later and bought them "a couple rounds of drinks." Smith played a game of pool with defendant and then left the bar with her at about 1:45 to go to the Key Club. The place was just closing and so, at her suggestion, they went to defendant's home in Smith's car. Defendant's wife let them in and then went back to bed. The two had some drinks and left in about half an hour to go to 285-287 Mulberry Street, a hotel premises where the Dreamland Bar was located. Smith parked his car and the couple went upstairs to a room which defendant rented and to which Miss Pitts had a key. She said that Smith removed his shirt and pants and lay down across the bed; she remained fully dressed. After casual talk she asked Smith to leave some money to pay for the room, and he allegedly told her to look in his pants pocket and get his wallet. She did so and watched him count the money. He gave her $10 and then put his wallet, containing $32, in his back pants pocket.

At about this time a young woman, Geraldine Hilliard, knocked at the door. Miss Pitts, who knew her only as "Jerry," let her in and introduced her to Smith. Soon all three left to go down to the street. It was then after 4 A. M. Smith asked if Miss Pitts wanted to get some coffee and "other drinks." She refused the invitation and he then drove off. Miss Pitts walked down Mulberry Street and cut through the parking lot near Orchard Street. Smith

drove in, parked and asked her to get into the car because he wanted to talk to her. She testified that after she got in two men suddenly appeared, one on each side of the car. She could not tell who the man on Smith's side was, but could distinguish the one near her—a young Negro whom she did not know and who had a board in his hand. When he swung her door open and asked what she was doing in the car, she managed to get out and run away. After riding about in a taxicab for 15 or 20 minutes she saw defendant on Broad Street and picked him up. She noticed a bleeding cut on the side of his left eye and asked what happened. According to her, defendant said that Smith threw a stick at him and that "they had a hell of a struggle around there." Asked whether Smith was hurt, defendant's answer was "I don't know. I think so," and then suggested that they go back to the parking lot and see about it.

Miss Pitts testified that when they got back to the parking lot and she saw Smith lying on the ground, she said to defendant, "He looks like he's dead," to which defendant replied, "Yes, he may be." Asked if he had taken Smith's money, he said he had not. Miss Pitts then asked, "Well, you didn't kill him, did you, because he looks dead?" Defendant said, "No, I did not kill him but I don't know what that boy did."

Miss Pitts stated that defendant then arranged to have a man drive her back to work in South Plainfield, and accompanied her on the trip. She saw defendant again that evening, at which time she again asked whether he had killed Smith. He replied that he "definitely did not kill that man but they had a fight."

The police had taken Miss Pitts into custody on Sunday night, May 23. Cross-examination elicited the following:

"They asked me to give them a statement. They questioned me and questioned me but I didn't give a statement that night, but the next morning [Monday, May 24] when they took me down there was when I give the statement.

\*         \*         \*         \*         \*         \*         \*         \*

* * * I gave the same statement that Eugene Franklin was supposed to have given them.

Q. You mean they told you what Eugene Franklin had said? A. That's right.

*   *   *   *   *   *   *   *

Q. Did they tell you the statement that Eugene Franklin had given them? A. Well, I'd like to say this: I didn't give the same statement but some of the things that's written there or some of the things they told me that Eugene Franklin had given them as a statement.

Q. I see what you mean. In other words, the police in questioning you * * * told you some of the details of what was supposed to have occurred on the night of May 18 and the early morning of May 19? A. That's right.

Q. Details which you have forgotten or didn't remember or didn't know. A. I didn't forget any of them."

Miss Pitts said she had seen defendant when he was brought to headquarters on May 23. Asked whether she had noticed his condition, she replied, "I noticed that he had a bruise on his head. He had been badly beaten."

In the course of cross-examination Miss Pitts was asked about her condition at the time she went to the parking lot. She said she had had "about three or four drinks," only one of them being with defendant before she met Smith. This led defense counsel to inquire about a letter she had written to defendant in jail on October 11, 1965, in which she said she was "not too well. My nerves aren't too good." When the attorney inquired whether that was the nervous condition for which she had been committed in 1956 for acute alcoholism, the prosecutor objected. The objection was sustained. At this point the judge excused the jury so that the matter could be argued at greater length.

Counsel insisted he had a right to go into the question of Miss Pitts' alcoholism. He said,

"* * * It bears upon her credibility and can be recognized as a condition which could be considered by the jury with respect to her testimony. Particularly in view of the fact that there was considerable drinking done on the night and morning of the event in question."

The trial judge's comment was that the mere fact Miss Pitts had been committed for alcoholism did not mean she could not tell the truth. Defense counsel stated that the next question he intended to put to Miss Pitts was whether she had been committed for acute alcoholism in 1956. When the State objected that the defense could not belatedly go into the question of competency, counsel made it clear that he was not attacking Miss Pitts' competency but her credibility. The trial judge sustained the objection on the ground that 1956 was too remote in time from the crime committed in 1965.

Miss Pitts was then asked whether she had ever been committed to any institution since 1956 for alcoholism. Her answer was that she had been in Trenton State Hospital in 1956 for "a couple of days," and in Martland Medical Center in 1959. Although defense counsel said he would tie these commitments to the time of the homicide through Miss Pitts' probation officer, the judge sustained the prosecution's further objection and said he would not permit it. The jury was then brought back into the courtroom.

Since defendant did not take the stand in his own behalf, the only account the jury had of his side of the affair was the signed statement he had given the police on Tuesday morning, May 25. One of the grounds for reversal advanced on this appeal is that the introduction of this statement in evidence violated defendant's constitutional rights. We shall deal with that question later in this opinion; for present purposes we refer to the statement only to provide a contrast with Miss Pitts' testimony.

Defendant said Miss Pitts had come to his Lincoln Street home at 6:30 or 7 P.M. on May 18. After remaining there two or three hours, they visited "several taverns on the hill and downtown," finally reaching Mulberry Street at about midnight. They "stopped in several taverns, Tick-Tock, Dreamland, Guys and Dolls and generally walking around in the Mulberry Street area." A "colored fellow" spoke to Miss Pitts and walked with her to the B&M Bar, defendant

following about 15 minutes later. Upon entering the place he bought a round of drinks for Miss Pitts and the couple she was sitting with at the bar, and then went to the pool table area in the back. After playing awhile he was challenged to a game by a white man he later learned was Smith. Defendant said that when he left the tavern shortly after, Smith was seated at the bar next to Miss Pitts. After visiting a nearby tavern, defendant returned to the B&M Bar and was told that Smith and Miss Pitts had left in a cab for the Key Club. It was close to 2 A.M.

Defendant went looking for Miss Pitts, and eventually took a cab to his home on Lincoln Street, where he thought she might be. He whistled for her from outside; his wife answered and told him Miss Pitts was not there. He rode back to the hotel at 287 Mulberry Street, went upstairs to his room, found it padlocked and then started walking back to Lincoln Street. On the way he met a man he knew only as "Robert," who accompanied him to his home. Upon arriving there, defendant again whistled for Miss Pitts. His wife answered, "Coming down." He and Robert then stood at the corner and saw Miss Pitts and Smith come out of the house, get into Smith's car, and drive off. Defendant and Robert walked back to 287 Mulberry Street where they found the Smith car parked out front. Assuming that Smith and Miss Pitts were in his room, defendant went upstairs and listened at the door. He recognized a man's voice and Miss Pitts', and then rejoined Robert who had been waiting out front. At that moment "Jerry" and a man came out of 287. Defendant told her that Miss Pitts had a caller upstairs and could not do anything with him: "Maybe you can." He took her up to the room, knocked and let her enter without showing himself. He heard Miss Pitts tell her that nothing was happening and they were leaving. "Jerry" came down first, followed by Smith and Miss Pitts soon after. When Smith went to his car at the curb, Miss Pitts told defendant and "Jerry" that Smith had done nothing and that he had $32 in his pocket.

Miss Pitts did not accept Smith's offer to accompany him, and so he drove away by himself. Defendant said she started walking down Mulberry Street and then "disappeared." Some five minutes later he asked Robert to accompany him. They walked toward the parking lot and saw the Smith car there. Defendant's account of what then happened, as it appears in his signed statement, follows:

"I spoke to Robert saying, 'There's the car over in the lot. Get your stick.' He picked up a stick from the lot and I did, too. I told Robert to go to the passenger's side and I would take the driver's side. When I got to the car Robert opened the door on Carrie's side. She got out, screamed and ran or walked towards Orchard Street. I saw Robert then get in the car on the passenger's side. The windows on both sides were down. Smith looked in the direction of Robert.

I put my knee against the car door and I had the stick in my right hand in view but not upraised. Smith and Robert are scuffling in the car. I heard Smith say, 'All right, all right, I'll go. I did not bother her. She got in the car with me.' Robert was saying something but what it was I do not recall. Then I heard Smith call Robert [obscenity] and then Smith made a lunge and got out of the car and I swung on him with the stick. I hit him on the arm, on the leg, on the head, and by this time Robert had come around the car and he started to swing his stick at Smith, and while Robert and I are both swinging I get hit on the left side of my face by the corner of the eye with Robert's stick. Smith had no stick. Somehow Smith managed to catch hold of Robert and Smith was giving Robert a shellacking with his fists and Robert could not get loose. Then Robert broke loose and Smith started to run towards Mulberry Street. Robert went towards Orchard Street and I went out an alley to East Kinney Street."

Defendant went on to relate that he walked over to Broad Street, and when he saw Miss Pitts in a cab, stopped it and got in. After driving around awhile, they left the cab and walked back to the parking lot where they found Smith on the ground. There was money scattered about and defendant picked up 80 cents to a dollar in change. They then returned to 287 Mulberry Street; Miss Pitts went upstairs and came back with the $10 Smith had earlier given her. After having something to eat, the two went to wait for a bus, at which time Robert came along and said that "he

stabbed that [obscenity] four times." Defendant then arranged to have a man drive Miss Pitts back to South Plainfield. He and Robert accompanied her. Defendant said he saw Miss Pitts again at 7 p.m. on May 19 at his Lincoln Street home, and showed her a newspaper account of Smith's death.

In the course of his statement defendant was asked why he went to the parking lot in the first place, and his answer was, "Robert and I went to see if Carrie got the $32 and if she had not, Robert and I agreed to take it from Smith." He admitted having a knife at the time but denied using it to stab Smith. He also denied seeing a knife in Robert's hand during the scuffle.

## II

We deal first with the claim that the trial judge erroneously restricted cross-examination on the question of Miss Pitts' chronic alcoholism. Defense counsel's attempt to have that matter considered by the jury because it bore upon the credibility to be assigned her testimony was rejected on the ground, as stated, that her drinking habits were too remote in time from the date of the homicide. We hold that ruling to have been prejudicial error, requiring a new trial.

It will be recalled that on direct testimony Miss Pitts stated that she went to several bars with defendant following dinner at his home. After leaving him at the Dreamland tavern she met Smith at the B & M bar and had "a few drinks" with him. When defendant came in sometime later, he bought them "a couple rounds of drinks." And when she and Smith left that bar to go to the Key Club and found it just closing, they drove to defendant's home and had some drinks there. This account does not jibe with what she said on cross-examination—that she had had only three or four drinks before going to the parking lot, only one of them being with defendant before she met Smith.

Nor is her latter testimony consistent with defendant's account in the written statement he gave the police. He

said that after spending two or three hours at his home with Miss Pitts they "went into several taverns on the hill and downtown," finally reaching Mulberry Street where they stopped in several taverns, the Tic-Toc, Dreamland, and Guys and Dolls. Later, when he followed her to the B & M bar, he bought her and the couple she was with a round of drinks, at which time Smith appeared on the scene to sit with her.

We turn to the testimony adduced on remand. Dr. Kesselman testified that at the time he examined Miss Pitts she denied drinking to excess on the evening in question, indicating that she had only three gins, half a bottle of beer, and orange soda. She admitted to hallucinating at times when under the influence of alcohol. She told the doctor that she had been committed to the Trenton State Hospital in 1956, suffering from delirium tremens. There were two subsequent admissions to the Newark City Hospital for alcoholism, the last in 1959. In 1965 she was charged with soliciting and placed on probation; at that time "she projected responsibility for her soliciting upon [defendant], who forced her into this activity." During the same year she was charged with violating probation by being drunk and was sentenced to 30 days in the Essex County jail. She also told Dr. Kesselman, "I'm an alcoholic and shouldn't drink." To quote the doctor, she had "turned to religion and is reformed, question mark, from her alcoholism." He said that Miss Pitts had a clear recollection of the events of the night of May 18/19 and had stated in "lucid fashion the details leading up to the alleged offense." Dr. Kesselman's diagnosis, already referred to, was that she had a "Personality pattern disturbance, emotionally unstable personality with alcoholic tendencies (in remission)" and at the time of the homicide "was able to understand the nature and quality of her acts and knew and was able to distinguish right from wrong and was able to testify."

Asked on cross-examination what history or information Miss Pitts gave him that led to this conclusion, Dr. Kessel-

man replied, "The fact that she was able to, lucidly and in detail, recollect all the details leading up to the alleged offense, and she, by her own statement, indicates that she de-emphasized any over-indulgence of alcohol at that particular time." He had not elicited the extent of her drinking for two weeks prior to the offense, but had accepted her volunteered information about what she drank during the preceding 24 hours. Nor had he elicited just what would constitute an excess of alcohol for her to experience hallucinations. The only way he could determine what her condition was on May 17 was to "retroject back" from her ability to recall what had transpired at that time. In his opinion, had she been under the influence of alcohol, she would have experienced some amnesia as to the details of the offense. Further cross-examination brought out that Miss Pitts had not told Dr. Kesselman when she began to abstain from drinking or when she had turned to religion. He also admitted that, generally speaking, one of the characteristics of an alcoholic is untrustworthiness, and it is "common knowledge that the heavy drinker is often a heavy liar."

Reference should also be made to defendant's testimony at the supplementary hearing on remand. He said that when Miss Pitts came to his home on the evening of May 17 she had already consumed a drink or two out of half a pint of gin she had. She not only finished the bottle but also drank some of the gin he had on hand before going out with him. She had a drink at their first stop, the Dreamland Bar, and also at the other taverns they visited that evening. However, she was not "staggering drunk." Defendant further testified that Miss Pitts had been drunk and exhibited "constant" nervousness during the two-week period preceding the crime. Asked if she could control all the liquor she consumed, his answer was "No."

Our concern here is not with Miss Pitts' competence to testify, in the sense of her having had sufficient mental capacity to do so. Rather, we are concerned with the question

of her credibility. This was the real purpose of defense counsel's unsuccessful attempt to cross-examine her as to her commitments to institutions, the result of her heavy drinking.

■ The mental qualification of a person to be a witness is a matter lying within the discretion of the trial judge. *State v. Butler*, 27 *N. J.* 560, 602 (1958), where we observed that such discretion was to be exercised in light of the following:

"A person does not have to be entirely sound mentally in order to qualify as a witness. A certain minimal intelligence is required. He should have sufficient capacity to observe, recollect and communicate with respect to the matters about which he is called to testify, and to understand the nature and obligations of an oath. * * * Where there is evidence of mental derangement or feeble-mindedness, the inquiry is whether the deficiency is sufficient to render his testimony untrustworthy. * * *." (Citations omitted)

Proof that Miss Pitts had been drunk on previous occasions would not, of course, establish that she was intoxicated on the evening of the homicide. The latter condition must be directly proved. See 3 *Wigmore on Evidence* (3d ed. 1940), § 933, p. 480; *Shelly v. Brunswick Traction Co.*, 65 *N. J. L.* 639, 641 (*E. & A.* 1900). Full exploration of Miss Pitts' addiction to alcohol would be entirely relevant on the question of the credibility to be assigned to her detailed testimony and apparent total recall of all that allegedly happened before, at and after the fatal attack upon Smith.

■ We conclude that the trial judge, in cutting short defense counsel's cross-examination of Miss Pitts when he sought to affect her credibility, visited substantial prejudice on defendant. The jury did not have the benefit of what we now know of Miss Pitts' drinking habits, the physical and mental effects of alcohol upon her (including hallucinating), and her hospital admissions, so that it could reach an informed judgment as to whether her testimony was to be believed. The conviction must therefore be reversed. The new trial will afford defendant the fullest opportunity to de-

vclop all available facts relating to Miss Pitts' drinking on the night of May 18/19 and prior thereto, the history of her addiction to alcohol and the effects which drinking had upon her, including the need for institutional treatment— all this for the sole purpose of affecting her credibility.

## III

We may conveniently consider together defendant's contentions that he was denied due process when the signed statement he gave the police was admitted into evidence, and that the trial judge abused discretion in refusing to hear, outside the presence of the jury, his testimony as to the voluntariness of that statement. The claim here is that the statement was the product of lengthy interrogation and police brutality.

. Defendant did not take the stand, and so we have no direct statement from him that he was beaten. The only reference is found in the testimony of Lieutenant Kinney, assigned to and in charge of the Homicide Squad of the Newark Detective Division. Referring to a post-confession examination of defendant by Police Surgeon Greifinger to which he had been summoned, Kinney testified, "I think [defendant] told the doctor the cops beat him." The police surgeon, however, denied having heard such a remark.

The hearing on the voluntariness of defendant's statement was conducted in the presence of the jury and followed what was then the usual form. (But see *Rule* 8 of the *Rules of Evidence, post,* with regard to our present procedure.) Police detectives took the stand to testify that defendant was at all times informed of his rights and properly treated. On cross-examination defense counsel posed a number of accusatory questions such as: Was defendant forced to lie on the desk and struck with the back of a ledger or with a sawed-off broomstick? Was he kicked in the shins and his feet stomped on? And Detective Rowinski, the officer who obtained a verbal statement from defendant as to his part in

the homicide and later his written statement, was asked whether he had not been removed from the interrogation room when he became too violent. He was also asked whether Kinney had not told him, "don't hit him in my presence." The answers of the detectives to all such questions were emphatic denials.

There are, however, two sets of circumstances bearing on voluntariness which, were there to be no new trial, would obviously concern us on appellate review. As it is, they must be thoroughly explored on the remand. The first is the heavily bruised condition of defendant's torso and extremities. The State's theory is that this resulted from blows he sustained in his fight with the deceased; the defense contends they were inflicted by the police sometime between the early hours of May 23 and defendant's signing of the statement on the morning of May 25.

Defendant was examined specifically with respect to the bruises on two occasions. The first was by Police Surgeon Greifinger at 10:40 A.M. on May 25, just after defendant had signed the statement. The second was at 6 P.M. on May 26 by Dr. O'Sullivan, the physician appointed by the assignment judge at the request of defense counsel.

Dr. Greifinger testified that he found a crusted laceration over defendant's left upper eyelid which could have occurred on May 18. He also found several black and blue areas: one measuring four by five inches on the left arm, another six by ten inches on the left anterior chest wall, and still another six by four inches on the anterior abdominal wall. There were similar areas on the back of both shoulders. Defendant complained of pain over the back of his head, but there were no objective findings. The doctor estimated that the black and blue areas were "three to five days or more old," based upon appearance.

On the other hand, Dr. O'Sullivan found six discrete transverse ecchymoses, some $7\frac{1}{2}$ inches in length, on the anterior abdominal wall in the area between the chest and navel, as well as between the navel and crotch. He explained

that by "discrete" he meant "separate and distinct." The front and side of both arms, particularly the left, showed multiple black and blue areas. Examination of the legs revealed multiple areas of contusions and abrasions on the front of the shinbone and on the top of both feet. All these marks, he said, were three to five days old. This opinion was based on the color changes which occur in the healing process—black and blue marks eventually turn greenish-yellow, then yellow, and finally take on the general color of normal tissue.

Under Dr. Greifinger's estimate the blows which produced the bruises could have been suffered anywhere from May 20 to 22, or even earlier if we give full value to his use of the words "or more." Dr. O'Sullivan's estimate would fix the dates from May 21 to May 23, the latter date being the day defendant was arrested. And yet defense counsel's questioning sought to establish that the beating which allegedly produced defendant's written statement occurred on May 24. Complicating the matter is the testimony of one Mason, a prisoner in the cell adjoining defendant's, that he noted red marks on defendant's body sometime between the evening of the 23rd and noon of the 24th. The testimony of the officers who were the first to see defendant following his arrest revealed nothing about the presence or absence of bruises; apparently, none of them had seen him without his clothing.

In sum, the evidence adduced is not entirely inconsistent with either theory of how the bruises came about. They might conceivably have been sustained in the fight with Smith or administered by the police. Further, they may have come from an entirely different and thus far unrevealed source, for the mean estimate of the time of their occurrence would suggest they were inflicted after Smith was killed but while defendant was still at large.

The cause of the bruises will have to be fully gone into at the new trial. The State will, of course, have the burden of establishing that defendant's will was not overborne and that the confession was the product of his essentially

free and unrestrained choice. *State v. Cook*, 47 N. J. 402, 415 (1966).

The second set of circumstances bearing on voluntariness relates to the interrogation of defendant while in custody—from early Sunday morning, May 23, until the preliminary hearing on the afternoon of May 26. Defendant contends that the testimony of the various police officers as to what they did during that period is implausible, and that when compared with defendant's recorded movements at police headquarters, the two can be reconciled only by inferring that there had been repeated and oppressive periods of interrogation.

We can disregard the hours which expired between defendant's arrest and the time he was placed in a cell between 6 and 7 A.M. on May 23. What happened thereafter can only be pieced together from the jailkeeper's log of defendant's movements and feedings and the testimony of the officers into whose custody he was charged when taken out of his cell. The log itself presents difficulties. Two copies were introduced in evidence—the original and a photocopy. They differ in that the symbol "A.M." appears in the latter on each of the two lines following an entry for 2:55 P.M., opposite the date May 24. The "In or Out" column showing the prisoner's movements contains consecutive "Ins" without an intervening "Out." The informality of jail administration is further shown by several unexplained changes in defendant's cell number. That part of the record dealing with the meals defendant had is no more enlightening, for it shows three feedings on May 23 and then a 25½-hour period with no feeding.

The log indicates that defendant was taken and kept out of his cell on at least six occasions for interrogation: (1) by Detective Rowinski from 10:10 to 10:50 A.M. on May 23; (2) by Detective Inneo from 2:45 to 3:15 P.M. the same day; (3) by Detective Valentino on May 24 from 5 to 5:45 A.M. (on the photocopy, with no "A.M." on the original), these times, as we have noted, appearing after 2:55 P.M. on May

404

24; (4) by Detective Rowinski from 9:55 A.M. to 12:45 P.M. on May 24; (5) by Detective Leonardi from 3:20 to 5:50 P.M. the same day and, finally, (6) by Detective Rowinski from 6:45 to 11:10 A.M. on May 25. There is yet another entry for May 24; defendant was taken to "Hdqs." by "Homicide Squad" at 1:05 A.M. and returned to his cell by Detective Dell'Ermo at 2 A.M.

Only Detective Rowinski and Inneo were called as witnesses. This leaves a hiatus in the proofs as to what was done with defendant and how he was treated when he was with the other detectives.

There is no occasion here to review at length the testimony Detective Rowinski gave for the State. Briefly, he said that he questioned the prisoner for about half an hour on Sunday morning. He did not see him again until about 10 A. M. the next morning, May 24, when he questioned him for about three hours. It was on this occasion that defendant "started to tell" of his participation in the homicide while Rowinski made notes. The detective said he solicited no written statement at the time because he "felt that certain facts still had to be investigated in this matter." He next saw defendant at 6:45 A.M. on May 25, when he took him from a cell to a room where they met Lieutenant Kinney and Detective Gross. It was then that defendant gave the statement which Lieutenant Kinney reduced to writing and had him sign.

As for Detective Inneo, who was called by the defense, he said that he had questioned defendant for about half an hour the afternoon of the 23rd. This was done on his own initiative; he did not communicate with either Rowinski or Kinney relative to this interrogation. He was vague as to whether his partner, Detective Dell'Ermo, was with him at the time, and whether he was with Dell'Ermo when the latter apparently questioned defendant in the small hours of the next morning.

It is important that the several interrogations of defendant by all the detectives who saw him prior to the preliminary

hearing be thoroughly explored at the new trial and a full explanation elicited as to what was done and what was said. Only in this way can the prosecution dispel doubts as to the voluntariness of the confession.

■ At the retrial the judge's finding on the question of the voluntariness of defendant's confession will formally have to be rested on proofs beyond a reasonable doubt, the standard recently established in *State v. Yough*, 49 *N. J.* 587, 600–601 (1967).

Defendant's contention that the trial judge's refusal to hear his testimony on the voluntariness of his confession outside the jury's presence amounted to an abuse of discretion becomes academic in light of our remand. The trial record discloses that defendant did not object to the judge's decision to hear testimony on the question of voluntariness in the presence of the jury. It was only after the State had presented all its testimony that he asked that he be heard outside the presence of the jury. The judge, noting that there had been no such earlier request, took the position that once defendant agreed to the procedure of having the jury present, it was also necessary that the jury hear all the evidence relating to voluntariness.

The reason for defendant's belated request was obvious. He had a prior criminal record, which included convictions for "mugging" and for living off the proceeds of a prostitute, and that record could, of course, have been used by the State to impeach his credibility.

There will be no such problem at the retrial. *Rule* 8 of *Rules of Evidence* (*N. J. S.* 2*A*:84*A*–16, Rule 8) provides that the trial judge, if requested, shall hear and determine the question of the admissibility of a statement against the penal interest of a defendant on trial in a criminal proceeding out of the presence and hearing of the jury. The rule embraces the procedure adopted by this court in *State v. Smith*, 32 *N. J.* 501, 559–560 (1960), *certiorari* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2*d* 367 (1961), and

most recently restated in *State v. Yough*, above, 49 *N. J.*, at *pages* 599–600. It reads:

"* * * If the judge admits the statement he shall not inform the jury that he has made a finding that the statement is admissible, and he shall instruct the jury that they are to disregard the statement if they find that it is inadmissible under the rules of law pertaining to such statements. The judge shall strike the statement from the record and instruct the jury to disregard it if he subsequently determines that a jury could not reasonably find that the statement was admissible."

It is necessary to dispose of defendant's final contention that his motion for acquittal should have been granted because the State failed to adduce sufficient evidence of a robbery or attempted robbery of the victim by defendant, the State's theory throughout having been that he was guilty of robbery-murder.

On a motion for acquittal, the evidence and the inferences reasonably to be drawn therefrom must be viewed in a light most favorable to the prosecution. If, on such a consideration of the facts, the jury could reasonably find the accused guilty beyond a reasonable doubt, the motion must be denied. *State v. Van Duyne*, 43 *N. J.* 369, 377 (1964), *certiorari* denied 380 *U. S.* 987, 85 *S. Ct.* 1359, 14 *L. Ed. 2d* 279 (1965). The inference of guilt may, of course, be based upon circumstantial evidence. *State v. Fiorello*, 36 *N. J.* 80, 86 *et seq.* (1961). We hold that the evidence adduced by the State supported an inference that defendant helped to rob, or attempted to rob, Smith.

The judgment of conviction is reversed and the matter remanded for a new trial.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, GOLDMANN and SCHETTINO—6.

*For affirmance*—None.