**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0864-14T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

STANLEY WALKER, JR., a/k/a
SELF STANLEY WALKER, JR.,
and QUENTIN WALKER,

     Defendant-Appellant.

_____

Submitted March 6, 2017 — Decided  March 21, 2017

Before Judges Sabatino and Haas.

On appeal from Superior Court of New Jersey,
Law Division, Passaic County, Indictment No.
12-01-0019.

Joseph E. Krakora, Public Defender, attorney
for appellant (Margaret R. McLane, Assistant
Deputy Public Defender, of counsel and on the
briefs).

Camelia M. Valdes, Passaic County Prosecutor,
attorney for respondent (Marc A. Festa, Senior
Assistant Prosecutor, of counsel and on the
brief).

PER CURIAM

On January 9, 2012, a Passaic County grand jury returned a fifteen-count indictment, charging defendant Stanley Walker, Jr. in nine of those counts[1] with first-degree murder, N.J.S.A. 2C:11-3(a) (count one); two counts of second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (counts two and eight); two counts of second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (counts three and seven); two counts of first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a) (counts four and five); fourth-degree aggravated assault by pointing a firearm, N.J.S.A. 2C:12-1(b)(4) (count six); and certain persons not to possess a handgun, N.J.S.A. 2C:39-7(b) (count nine).

Prior to defendant's trial, the trial judge denied his motion to suppress an oral statement he gave to the police and an

---

[1] Defendant's girlfriend, Elisa Quiles, was charged in the indictment with third-degree hindering apprehension, N.J.S.A. 2C:29-3(a)(2) (count thirteen); fourth-degree obstruction, N.J.S.A. 2C:29-1 (count fourteen); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count fifteen). Pursuant to a plea agreement, Quiles pled guilty to count thirteen and was sentenced to one year of probation "with up to 364 days in the" county jail. Counts fourteen and fifteen were dismissed. As required by the plea agreement, Quiles testified at defendant's trial as a witness for the State. A second co-defendant, Andre Morales, was charged in counts ten, eleven, and twelve with weapon and drug offenses, but he did not testify at trial and the disposition of these charges is not relevant to the present appeal.

A-0864-14T3

eyewitness identification.  Defendant does not challenge these rulings on appeal.

At the conclusion of the trial, the jury found defendant guilty of the lesser-included offenses of second-degree passion/provocation manslaughter, N.J.S.A. 2C:11-4(b)(2) (count one), and second-degree aggravated assault, serious bodily injury, N.J.S.A. 2C:1-b(1) (counts four and five).  The jury also found defendant guilty of counts three and eight.  The jury acquitted defendant of counts two, six, and seven, and the State dismissed count nine on its own motion.  The trial judge subsequently denied defendant's motion for a new trial.

At sentencing, the trial judge granted the State's motion for an extended sentence.  The judge merged count three into count one and sentenced defendant to eighteen years in prison on count one, subject to the 85% parole ineligibility provisions of the No Early Release Act ("NERA"), and three years of parole supervision upon his release.  The judge imposed seven-year terms, subject to NERA, with three years of parole supervision on counts four and five. The judge ruled that these terms would run concurrent to each other, but consecutive to the sentence imposed under count one. Finally, the judge sentenced defendant to a concurrent seven-year term on count eight, with a three-year period of parole

ineligibility.  Thus, defendant's aggregate sentence was twenty-five years, subject to NERA.  This appeal followed.

On appeal, defendant raises the following contentions:

POINT I

THE PROSECUTOR'S IMPROPER BURDEN-SHIFTING IN SUMMATION VIOLATED DEFENDANT'S RIGHT TO A FAIR TRIAL AND REQUIRES REVERSAL OF HIS CONVICTIONS, U.S. Const. Amend. V, XIV; N.J. Const. art I, ¶¶ 1, 10.

POINT II

THE DEFENDANT WAS DENIED A FAIR TRIAL DUE TO THE ABSENCE OF JURY CHARGES ON THE PRIOR CONVICTION OF A WITNESS AND HOW TO EVALUATE THE TESTIMONY OF A COOPERATING-WITNESS. (Not Raised Below).

POINT III

THE COURT ERRED IN ADMITT[ING] OTHER-CRIMES EVIDENCE WITHOUT FIRST CONDUCTING A 404(b) ANALYSIS AND WITHOUT ANY LIMITING INSTRUCTION. (Partially Raised Below).

POINT IV

THE DEFENDANT'S SENTENCE IS EXCESSIVE BECAUSE THE COURT IMPROPERLY IMPOSED AN EXTENDED TERM AND FAILED TO CONDUCT A THOROUGH YARBOUGH[2] ANALYSIS, IMPROPERLY GIVING CONSECUTIVE RATHER THAN CONCURRENT SENTENCES.

A.   The court improperly imposed an extended term sentence because it engaged in impermissible double-counting and failed to give adequate weight relevant mitigating factors.

---

[2] State v. Yarbough, 100 N.J. 627 (1985), cert. denied, 474 U.S. 1014, 106 S. Ct. 1193, 89 L. Ed. 2d 308 (1986).

B. Consecutive sentences were improper because Wade, Uddin, and Moore were acting in concert as the initial aggressors against [defendant].

Because we agree with defendant's contention in Point I that the prosecutor, in his summation, improperly commented to the jury on defendant's failure to testify, we reverse defendant's conviction.

## I.

We derive the following facts from the evidence produced at trial. As noted above, Quiles was defendant's girlfriend. She had a child with her former boyfriend, Philip Ramos. On July 13, 2011, Quiles and Ramos had a heated argument about Ramos's child support payments while they were both at a house on Van Houten Street in Patterson.

While Quiles and Ramos were arguing, defendant drove up in a car. He asked Quiles if she was "okay," and she "said yes." Defendant then drove to the back of the house. However, Ramos testified that he and defendant argued and that defendant "just got angry and started acting crazy with me." Ramos then left and went to a location on Slater Street, where he met with some friends.

A-0864-14T3

After the argument, Quiles told defendant about her argument with Ramos. Defendant told Quiles that he was "tired of [her] baby father."

Later that day, defendant went to the Slater Street location and challenged Ramos to a fight over how he had treated Quiles. Ramos did not want to fight. Ramos testified that defendant started screaming and then pointed a gun at him. Defendant then "jumped in [his] car and left."

Ramos's friend, Syed Uddin, was present when this incident occurred. Uddin testified that defendant and Ramos got in a verbal dispute and then defendant left the scene. Uddin testified that he "never saw [defendant] with a gun" and that "[n]obody was waving a gun around."[3]

Ramos testified that six of his Slater Street friends, Uddin, Dennis Wade, Lanier Moore, Andre Morales, Itavious Reid, and Miguel Chica, became angry at defendant over this incident and went to confront defendant at the house on Van Houten Street. Ramos stated that he was unable to go with his friends because he had to attend a program as part of the conditions of his parole. Uddin testified

---

[3] Based on his alleged actions in this incident, defendant was charged in counts two, six, and seven of the indictment. At the conclusion of the trial, the jury acquitted defendant of each of these charges.

A-0864-14T3

that "[e]verbody in the group . . . wanted to fight" with defendant.

The six men drove to Van Houten Street in two cars. Wade drove one car and Moore drove the other. When they got to their destination, the men parked the cars in the street in front of the house. When they arrived, defendant, Quiles, and her child were sitting on the back porch. They heard the men out front, and Quiles told defendant to stay inside the house while she went out front to try to diffuse the situation. Quiles took her child with her. Moore testified that the men "were really mad" and yelled at Quiles, "where the fuck is he."

Quiles testified that she started talking to Morales, who was her son's godfather. She told the men to go away or she would call the police. Quiles stated that one of the men then saw defendant "through the back through the alleyway." Quiles testified that Wade then pulled "a big machete out of his pants." Quiles asserted that she told Wade to stop, but Chica said, "fuck that, and he pulled out a gun and pointed it directly at" defendant. Quiles testified that Chica pulled the trigger twice, but the gun jammed both times. The police later found a live bullet in the alleyway.

Each of the four witnesses who testified as to what happened next, Reid, Uddin, Moore, and Quiles, gave different accounts.

A-0864-14T3

Reid stated that he "heard gunshots" and "just started running" until he was shot in the leg. He saw Wade driving his car away from the scene, but Wade's car then hit the sidewalk and the car flipped over. Reid did not know who shot him.

Uddin claimed he saw that defendant "had, like, something—it looked, like black or something, like—it looked like it was black, and then [Uddin] ran to the front car to get cover . . . because all [he] heard was boom, boom." Once he was by one of the car's tires, Uddin testified that he "felt something go through [his] feet" and believed he had been struck by a "ricochet." Uddin stated he was "not sure" that defendant fired any of the shots, but he opined that it "was probably him."

Moore testified that he was sitting in the driver's seat of his car and watching the argument. He then heard Wade yell at him to start the car. Moore alleged that as he started the car, he saw "a hand and a gun come out the alleyway, but that's all" he saw. Moore testified that he never saw who was shooting.

Prior to the trial, Quiles told the police that defendant did not have a gun. However, after she was arrested, she gave another statement in which she asserted that defendant did have a gun. Quiles later testified at trial that after Chica tried to shoot defendant, he pulled out a gun and started shooting at the men. She and her child then ran inside the house.

A-0864-14T3

In his oral statement to the police, defendant asserted that when he walked out of the house to the alleyway, one of the men pulled out a gun. Defendant stated that the man with the gun tried to shoot him, but the gun "didn't go off." Defendant then saw another man take out a machete and defendant took off running. Defendant told the police, "I just kept going. Like I ain't never looked back until this day, know what I'm saying? Like I ain't never looked back at all. Kept going. That's that."

Moore drove Uddin and Reid to the hospital. Uddin was treated for a gunshot wound to his foot and Reid was treated for a wound to his leg. Uddin was released that night, but Reid required surgery and he remained in the hospital for almost three weeks.

The police who responded to the scene found Wade dead in the driver's seat of his car. The autopsy revealed that Wade died from a gunshot wound to his back which severed his aorta. The police did not find any bullet holes in the car, but the driver's side and rear passenger side windows were open. The police found a machete "[b]etween the driver's seat and the door molding."

Quiles testified that she did not see defendant again until around midnight. A few days later, defendant, Quiles, and Quiles's child went to upstate New York, where they stayed one night in a hotel. Quiles and her child returned to Patterson the next day. On July 16, 2011, an arrest warrant was issued for defendant, but

9

he could not be located. On July 28, 2011, defendant was arrested in North Carolina.[4]

Defendant did not testify at trial and did not call any witnesses on his behalf.

## II.

Defendant's defense at trial was that although he was present at the scene when the shooting started, he ran away as soon as he heard the shots fired. Obviously, defendant had no obligation to testify at trial or to tell the jury who shot Wade, Uddin, and Reid. State v. Jones, 364 N.J. Super. 376, 382 (2003) ("It is, of course, a basic tenet of our criminal jurisprudence that a defendant has no obligation to establish his innocence.").

However, during his summation, the prosecutor told the jury:

> Ladies and gentlemen, when the witnesses told you that he [sic] saw the individual shooting from the alley, I don't expect you to believe it just because they came in here and said it. But the physical evidence doesn't lie. Use your common sense. Say does what the physical evidence tell us match what they said.
>
> I don't expect you to believe them just 'cause they walked in here. Does Ramos have a criminal record? Sure, he does. Does Syed Uddin have a criminal record? Sure, he does. I'm not asking you to believe them because

---

[4] As noted above, Quiles was later indicted for hindering apprehension, obstruction, and endangering the welfare of her child because she brought the child outside the house with her when the six men arrived looking for defendant.

they're Boy Scouts. I'm asking you to believe them because what they said matches the evidence.

Ladies and gentlemen, did six guys go down there looking for defendant? Yeah, they did. Was Dennis Wade one of them? Yeah, he was. Defendant himself says he went outside to the front to confront them. <u>Who shot those men? Who else was in the alley? If anybody else was in the alley, defendant would have told you that.</u>

[(emphasis added).]

At the end of the prosecutor's summation, defense counsel objected to these comments and moved for a mistrial, based upon the prosecutor's statement that "[i]f anybody else was in the alley, defendant would have told you that." The trial judge dismissed the jury for the day and reserved decision on defendant's motion.

The next day, the trial judge denied the motion. The judge acknowledged that the prosecutor specifically told the jury that if anyone else was in the alley, defendant would have told "you," meaning the jury, who that person was. However, the judge found that the prosecutor really meant to say that if anybody else was in the alley, defendant would have told <u>the police</u> that <u>in the statement he gave to the police</u>. The judge noted that a court should consider whether a curative instruction should be given when a prosecutor comments "on the accused's silence," but the

judge denied defendant's motion without giving such an instruction to the jury.

In our judgment, the trial judge's characterization of the prosecutor's comment was overly generous. In addition, it overlooked the fact that the remarks, coming right after the prosecutor reminded the jury that the State's four witnesses had come to court and "told" them what happened, went right to the crux of the defense.

We have repeatedly commented on the impropriety of remarks by the prosecutor implying to a jury that a defendant has an obligation to present any evidence at all. In Jones, the defendant was charged with aggravated assault, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. Jones, supra, 364 N.J. Super. at 378. He was found not guilty of aggravated assault and convicted of the two weapons offenses. Ibid. During the course of the case, defense counsel cross-examined various witnesses to elicit testimony that no fingerprint tests had been performed on the weapon, and he commented on that omission in his summation. Id. at 381-82.

In response, the prosecutor noted that while the defendant had no burden of proof, the jury should ask itself why defendant had not dusted the gun for fingerprints. Id. at 382. We noted the Supreme Court's statement in State v. Frost, that "[t]he impact

of violating a defendant's right to a fair trial cannot be measured by, or weighed against, the quantum of evidence bearing upon his innocence or guilt." State v. Frost, 158 N.J. 76, 87 (1999).

We further noted that the Court in Frost directed a tripartite test to measure the impact of improper remarks in a prosecutor's summation and determine a proper remedy:

> (1) whether defense counsel made timely and proper objections to the improper remarks;
>
> (2) whether the remarks were withdrawn promptly; and
>
> (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them.
>
> [Id. at 83.]

Here, defendant's attorney did make a timely objection, the remarks were not withdrawn, they were not stricken from the record, and a corrective instruction was not given.

State v. Cooke is also instructive. 345 N.J. Super. 480 (App. Div. 2001), certif. denied, 171 N.J. 340 (2002). In that case, the defendant was charged with two counts of burglary, two counts of aggravated sexual assault, and two counts of sexual assault. Id. at 483. The jury found him guilty of one count of sexual assault. Ibid. The victim testified that on two occasions, he awoke on the living room couch of his home to find a man

performing oral sex on him.  Id. at 484.  The police responded to the second incident and arrested the defendant.  Ibid.

Although the defendant did not testify or present any witnesses, the defense at trial was consent.  Id. at 485.  In the course of his summation, the prosecutor remarked:

> Now, let's look back at the defense theory.  Consent again.
>
> Now, the Judge instructed you [on] the evidence in this case, where does it come from?  From the stand when the witness takes it.
>
> You have zero in this case about consent. The only evidence you heard over there was the victim say that there was no consent.
>
> [Ibid.]

The defendant's attorney did not move for a mistrial, but did object, and the trial court gave a clear and strong curative instruction.  Ibid.  The judge directed the jury as follows:

> Ladies and Gentlemen of the jury.  I am instructing you to totally disregard anything you might have heard referring to the only evidence you heard over there.  Okay.  You must totally disregard this statement. Do not consider it.  Wipe it from your mind, and certainly you're not to use it during any of your deliberations.  Everybody understand that?
>
> [Id. at 486.]

We noted that the prosecutor's remarks were clearly improper because "a prosecutor should not in either obvious or subtle

fashion draw attention to a defendant's decision not to testify." Ibid. (citing State v. Engel, 249 N.J. Super. 336, 382 (App. Div.), certif. denied, 130 N.J. 393 (1991)). However, we declined to reverse the defendant's convictions in light of the strong and immediate curative instruction provided by the trial judge. Ibid. Here, this defendant did not receive this relief.

Our Supreme Court recently held that it is permissible for the State to comment on a testifying defendant's post-arrest omissions and inconsistencies in a statement he gave to the police after waiving his or her Miranda[5] warnings. State v. Kucinski, ___ N.J. ___ (2017) (slip op. at 36). Moreover, "[i]t is not an infringement of a defendant's right to remain silent for the State to point out differences in the defendant's testimony at trial and his or her statements that were freely given." Id. at 37 (quoting State v. Tucker, 190 N.J. 183, 189 (2007) (emphasis in original).

As stated above, however, the prosecutor did not tell the jury that if anybody else was in the alley, defendant would have told the police that in his oral statement to them. Instead, the prosecutor clearly stated that if someone other than defendant was in the alley, defendant would have told the jury that was what happened. The prosecutor's remarks were clearly improper because

_____

[5] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

they drew the jury's attention to the fact that, unlike the State's four eyewitnesses, defendant did not take the witness stand. The statement also impermissibly shifted the burden to defendant to disprove his guilt. Thus, we conclude that the judge should have excluded this portion of the prosecutor's summation and given a strong curative instruction. That did not occur.

This error was clearly not harmless. Here, the State's proofs were not overwhelming. Defendant was acquitted of all of the charges pertaining to the earlier incident with Ramos. Of the four witnesses to the shooting that followed, only Quiles specifically testified that defendant had a gun. However, Quiles had previously given a contradictory statement to the police, which she changed only after she was arrested and charged. In addition, there was testimony that one of the men who went to confront defendant had a gun and had attempted to shoot it.

Moreover, even if the State's evidence was strong, this would not give the prosecution license to present improper arguments to the jury, and it would not authorize us to disregard that impropriety when a defendant has properly sought relief but to no avail. Under these circumstances, we are constrained to reverse defendant's convictions and remand for further proceedings.

III.

A-0864-14T3

Our conclusion that defendant's convictions must be reversed makes it unnecessary to address defendant's contention in Point IV of his brief that the sentence the trial judge imposed was excessive. We add the following brief comments concerning defendant's remaining arguments.

As part of her plea agreement, Quiles agreed to testify honestly at defendant's trial. Quiles had also pled guilty to the hindering charge in count thirteen of the indictment, although she had not yet been sentenced. Defense counsel did not ask the trial judge to include Model Jury Charges (Criminal), "Testimony of a Cooperating Co-defendant or Witness" (2006) or Model Jury Charges (Criminal), "Credibility—Prior Conviction of a Witness" (2003) in the final charge to the jury. In Point II of his brief, defendant argues that the judge erred by not giving sua sponte instructions on these two topics. We disagree.

Because defendant did not object to the final charge the judge gave to the jury, we review the claimed error under the plain error standard. R. 2:10-2.

> In the context of a jury charge, plain error requires demonstration of "[l]egal impropriety . . . prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."

> [State v. Burns, 192 N.J. 312, 341 (2007)
> (quoting State v. Jordan, 147 N.J. 409, 422
> (1997)).]

A "[d]efendant is required to challenge instructions at the time of trial." State v. Morais, 359 N.J. Super. 123, 134 (App. Div.) (citing R. 1:7—2), certif. denied, 177 N.J. 572 (2003). Failure to do so creates a "presum[ption] that the instructions were adequate." Id. at 134-35.

Reviewed under that standard, we discern no error, let alone plain error. Generally, a defendant has a right, upon request, to a specific cautionary instruction that a witness' testimony must "be carefully scrutinized and assessed in the context of his specific interest in the proceeding." State v. Begyn, 34 N.J. 35, 54 (1961) (quoting State v. Spruill, 16 N.J. 73, 80 (1954)).

However, the charge carries "risks for the defendant because phrasing is difficult to avoid conveying to the jury an impression that the court is suggesting his guilt solely because the witnesses have admitted theirs and implicated him." Id. at 55. We have held that a judge may instruct jurors about a co-defendant "sua sponte if he or she thinks it is advisable under the circumstances." State v. Shelton, 344 N.J. Super. 505, 520 (App. Div. 2001), certif. denied, 171 N.J. 43 (2002). However, the Supreme Court has held that it is "[c]ertainly . . . not error, let alone plain error, for a trial judge to fail to give this

cautionary comment where it has not been requested." State v. Artis, 57 N.J. 24, 33 (1970).

Here, defense counsel did not request a cooperating witness instruction and, therefore, the judge did not err in failing to provide such an instruction to the jury. Moreover, a judgment of conviction had not yet been issued concerning Quiles's plea, which was contingent on her testimony at the trial. Therefore, an additional charge on the prior "conviction" of a witness would not have been appropriate.

In addition, defendant's attorney cross-examined Quiles extensively concerning the terms of her plea agreement and addressed this issue again in his summation. The trial judge's general charge on credibility provided the jury with factors upon which to assess Quiles's credibility. The judge instructed the jury that it could look to a witness's interest in the outcome of the trial, possible bias, and any other matters in evidence which would serve to support or discredit testimony. That charge adequately informed the jury as to the appropriate factors that it could look to in assessing Quiles's testimony.

Therefore, we reject defendant's contention on this point. We also note that because we have reversed defendant's convictions, he may ask for these specific jury charges on the remand should a trial be necessary to complete this case.

A-0864-14T3

Turning to Point III of defendant's brief, defendant admitted to the police in his oral statement that he "was high" on the date of the incident because he "was smoking" a "little weed" earlier that day. Prior to trial, defense counsel asked that the references to marijuana use be redacted from the statement when the State presented it to the jury. The trial judge denied defendant's motion, finding that under N.J.R.E. 404(b), the evidence was relevant to defendant's "ability to perceive events as they're unfolding and react to events at least as the way he portrays these events." The judge did not conduct an analysis on the record of the four factors set forth in State v. Cofield, 127 N.J. 328 (1992) before rendering his oral decision. He also did not give a limiting instruction to the jury when defendant's statement was presented. Defendant contends that the judge erred by admitting the unredacted statement without a limiting instruction.

In response, the State argues that defendant's marijuana use was part of the "intrinsic evidence" of the commission of the crime. "[E]vidence that is intrinsic to the charged crime is exempt from the strictures of Rule 404(b) even if it constitutes evidence of uncharged misconduct that would normally fall under Rule 404(b)" because it is not "evidence of other crimes, wrongs,

or acts."  State v. Rose, 206 N.J. 141, 177 (2001) (citation omitted).

In Rose, the Supreme Court approved of the Third Circuit's "workable, narrow description of what makes uncharged acts intrinsic evidence of the charged crime, and therefore not subject to Rule 404's directed purpose requirements."  Id. at 180 (citing United States v. Green, 617 F.3d 233 (3d Cir. 2010)).  In Green, the Third Circuit stated that "evidence is intrinsic if it 'directly proves' the charged offense" or if the "uncharged acts [are] performed contemporaneously with the charged crime [and] . . . facilitate the commission of the charged crime."  Supra, 617 F.3d at 248-49.

Here, it is by no means clear that defendant's marijuana use prior to the incident was "intrinsic evidence" that he committed the offense that followed.  Defendant's use of marijuana did not "directly prove" that he was the shooter.  Defendant did not smoke marijuana "contemporaneously" with the charged crime and the State did not argue that defendant's actions "facilitate[d] the commission" of the shooting.

In any event, the trial judge did not conduct a full analysis of the issue under either Cofield or Rose.  Just as significantly, the judge did not give the jury a limiting instruction on how it was to consider defendant's use of marijuana earlier in the day

of the shooting. It is well-established that if evidence of other crimes under Rule 404(b) is admitted, the judge must instruct the jury as to the limited purpose of the evidence and the restricted significance that the jury can attach to it. State v. Marrero, 148 N.J. 469, 495 (1997). The trial judge's limiting instruction "should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence." Cofield, supra, 127 N.J. at 341 (quoting State v. Stevens, 115 N.J. 289, 304 (1989)).

Moreover, even if defendant's marijuana use could be considered "intrinsic" to the shooting, a limiting instruction was still required. As we explained almost forty years ago in State v. Ciuffini, a defendant's "contemporaneous use of illegal and potentially dangerous drugs, insofar as it may relate to a witness' ability to perceive and recall, is highly relevant to credibility." 164 N.J. Super. 145, 154 (1978) (citing State v. Franklin, 52 N.J. 386, 398-400 (1968). However, although "this line of examination is proper . . . , the jury should be carefully instructed that any testimony about drug use is admitted solely for the purpose of evaluating credibility, and no other." Ibid.

Therefore, assuming for purposes of this opinion that the evidence of defendant's marijuana use was admissible under either Cofield or Rose, the judge erred by failing to properly instruct the jury on how to consider this evidence. Should there be a new

22

trial on remand, the parties may address this issue anew. However, we note that the cumulative effect of the judge's mistake on this point, when added to the prosecutor's improper statements during summation, provide further support for our conclusion that defendant's convictions must be reversed. State v. Simms, 224 N.J. 393, 407 (2016) (citing State v. Weaver, 219 N.J. 131, 155 (2014) (noting the duty of an appellate court to reverse a defendant's conviction "[w]hen legal errors cumulatively render a trial unfair").

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0864-14T3