701 A.2d 944

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ARVAUS WORMLEY, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ROBERT EDEN, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JAMES BROOKS, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted September 30, 1997—Decided October 22, 1997.

Before Judges PRESSLER, CONLEY and CARCHMAN.

*Ivelisse Torres*, Public Defender, attorney for appellants, Arvaus Wormley, Robert Eden and James Brooks (*Michele A. Adubato*, Designated Counsel, on the brief in A–5720–94T4, *Olivia Belfatto Crisp*, Designated Counsel, of counsel and on the brief in

A–5978–94T4, and *Michael B. Jones,* Assistant Deputy Public Defender, of counsel and on the brief in A–6466–94T4).

*Edward M. Neafsey,* Acting Union County Prosecutor, attorney for respondent (*Eileen Regan–Adams,* Assistant Prosecutor, of counsel and on the brief in A–5720–94T4, *Thomas M. Roughneen,* Prosecutor's Agent, of counsel and on the briefs in A–5978–94T4 and A–6466–94T4).

*Arvaus Wormley,* appellant, filed a pro se supplemental letter brief.

The opinion of the court was delivered by

CONLEY, J.A.D.

Tried jointly [1], each defendant was convicted by the jury of robbery and weapons offenses. As to the robbery, defendants Wormley and Eden were convicted of first-degree robbery with a firearm, *N.J.S.A.* 2C:15–1, while defendant Brooks was convicted of the lesser included second-degree robbery. All three, however, were convicted of possession of the firearm for an unlawful purpose, *N.J.S.A.* 2C:39–4(a). All three were also convicted of possession of the firearm without a permit, *N.J.S.A.* 2C:39–5(b).[2] Wormley and Eden were also, in a separate trial with the same jury, convicted of possession of a firearm by one previously convicted of kidnapping and/or robbery, *N.J.S.A.* 2C:39–7. Eden and Wormley were sentenced to extended terms; Eden to an aggregate term of fifty years with a twenty-year disqualifier, and Wormley to an aggregate term of fifty-five years with a twenty-year disqualifier. Brooks received an aggregate term of eight

---

[1] Each defendant has filed separate appeals. We consolidate the appeals for the purpose of a single opinion.

[2] Although the State's primary witness, William Nelson, identified more than one firearm, it was never seriously suggested that the firearm that was the predicate for the armed aspect of the robbery could have been other than the firearm that was the predicate for the two weapons offenses.

years with a three-year disqualifier. We reverse the convictions and remand for a new trial.

*I*

A detailed factual recitation might be of some interest, but for the purposes of this opinion we think the following summary is sufficient. The State's primary witness was William Nelson, who claimed to have been robbed at gun point of $40, a jacket and a key chain with a pink rabbit's foot. According to Nelson, there were three robbers, two with guns and a person in the getaway car whose face he did not see. Troy Tucker, a lifetime friend of Nelson, was the other primary witness. He happened onto the scene as the perpetrators were speeding off and passed his car, going the wrong way on a one-way street. Tucker made a u-turn and gave chase, ultimately leading to the arrest of defendants as their vehicle pulled into a gas station. Tucker, however, never saw the alleged robbery or the perpetrators and his chase of defendants' vehicle was based upon someone's having shouted to him as defendants' car passed him "yo, they robbed us." Meanwhile, Nelson and his friends were chasing another car that they thought was the getaway vehicle, only to be thwarted in their efforts when an officer they asked for help, after the vehicle had stopped and the occupants got out, refused to respond.

In addition to a pellet gun, items that Nelson claimed had been taken from him, a jacket he identified as his and a key chain with a pink rabbit's foot, were found in defendants' vehicle. Nelson claimed that three of his friends who had been with him when he was robbed also had their coats or jackets taken. Several coats, other than Nelson's, were, in fact, found in defendants' car, along with $200. But, aside from Nelson, only one other person responded to the police station to claim a coat, and Nelson denied that that person was one of the other victims.

During trial, Nelson identified Eden and Wormley as the two gun-toting thieves. Yet he did not select Wormley's photo from the police photo line-up shortly after the incident and he selected

the photo of a person all agree was not involved at all. He did select Eden's photo, but he also selected Brooks' photo. Brooks was the driver of the car Tucker chased. Nelson, however, consistently maintained he did not see the driver of the getaway car and he did not identify Brooks at trial. In addition, Nelson claimed that one of the two men with guns wore a beige or brown-colored jacket. According to the officers on the scene, however, neither of the two defendants Nelson claimed he saw, Eden and Wormley, was wearing a beige or brown-colored jacket when they were arrested at the gas station.[3]

The evidence found in defendants' car certainly was enough to link them to some sort of theft. But the critical aspect of the State's case was the claim that much more than a theft had occurred. As to that, Nelson's testimony was essential. It was only he who linked the pellet gun [4] found in defendants' vehicle to the theft, identifying it as one of the guns he and his friends had been threatened with. Although he insisted both perpetrators "[were] waving the guns towards [his] face," an exhaustive search by the police failed to locate a second gun.

## II

On appeal, defendant Wormley raises the following contentions:

POINT I. THE IN–COURT IDENTIFICATION BY WILLIAM NELSON WAS SO IMPERMISSIBLY SUGGESTIVE AS TO BE UNRELIABLE AND RE-SULTED IN THE SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MIS-IDENTIFICATION.

---

[3] One of the initial officers on the scene, Officer Debbie, testified that Eden was wearing a black jacket and Wormley was wearing a blue sweatshirt with no hood. Another officer, Officer Passarelli, did say that Eden was wearing a dark coat and dark hooded sweatshirt and Wormley was wearing a brown coat. He, however, saw defendants later at headquarters.

[4] The State's expert at trial testified that the pellet gun was not operable because it lacked a $CO_2$ cartridge and parts of the trigger were defective, though as originally manufactured, such guns are capable of firing projectiles.

POINT II. THE LIMITATION OF THE CROSS–EXAMINATION OF WIL-
LIAM NELSON INFRINGED UPON THE DEFENDANT'S RIGHT TO
CONFRONT THE WITNESSES AGAINST HIM.

POINT III. IT WAS ERROR FOR THE COURT TO ALLOW INVESTIGATOR
KOTLARZ TO TESTIFY AS AN EXPERT ON FIREARMS.

POINT IV. IT WAS ERROR FOR THE COURT TO FAIL TO CHARGE THE
LESSER–INCLUDED OFFENSE OF THEFT.

POINT V. THE VERDICT WAS AGAINST THE WEIGHT OF THE EVI-
DENCE.

POINT VI. IT WAS ERROR FOR THE COURT NOT TO GIVE A *CLAWANS*
CHARGE AT DEFENDANT'S REQUEST AND TO PRECLUDE COM-
MENTS OF THE NON–PRODUCTION OF MR. ARNOLD AS A WITNESS.

POINT VII. THE STATE'S MOTION FOR AN EXTENDED TERM SEN-
TENCE SHOULD NOT HAVE BEEN GRANTED.

POINT VIII. THE SENTENCE IMPOSED UPON THE DEFENDANT WAS
EXCESSIVE AND SHOULD BE REDUCED. (Not Raised Below).

In a *pro se* supplemental brief, defendant Wormley contends:

POINT I. THE DEFENDANT/APPELLANT WAS DENIED THE EFFEC-
TIVE ASSISTANCE OF COUNSEL AT HIS TRIAL IN VIOLATION OF HIS
CONSTITUTIONAL RIGHTS UNDER BOTH THE SIXTH AMENDMENT
OF THE UNITED STATES CONSTITUTION AND ARTICLE I, PARA-
GRAPH 10 OF THE NEW JERSEY CONSTITUTION.

1. The Failure To Move For A Dismissal of the Indictment.
2. The Failure To Make A Timely Motion For A New Trial.
3. Failure To Investigate Prior Convictions.

POINT II. THE APPELLANT SHOULD BE GRANTED A NEW TRIAL
BECAUSE OF THE CUMULATIVE EFFECTS OF ALL THE VIOLATIONS
AND CONSTITUTIONAL ERRORS COMMITTED AGAINST HIM.

Defendant Eden raises the following contentions:

POINT I. THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF THE
VICTIM'S OUT–OF–COURT IDENTIFICATION OF DEFENDANT.

POINT II. THE COURT ERRED IN FAILING TO QUESTION THE EMPAN-
ELED JURORS INDIVIDUALLY TO DETERMINE IF THE EXCUSED
JUROR HAD TAINTED THE REMAINDER OF THE PANEL. (Partially
Raised Below).

POINT III. THE INTRODUCTION OF HEARSAY EVIDENCE VIOLATED
DEFENDANT'S RIGHT OF CONFRONTATION UNDER THE STATE AND
FEDERAL CONSTITUTIONS.

POINT IV. THE COURT'S REFUSAL TO PERMIT CROSS–EXAMINATION
OF THE STATE'S MAIN WITNESS REGARDING HIS DRUG HABIT
WHICH AFFECTED HIS ABILITY TO PERCEIVE THE EVENT AND
IDENTIFY THE ASSAILANTS VIOLATED DEFENDANT'S RIGHT OF
CONFRONTATION.

POINT V. THE SENTENCE WAS MANIFESTLY EXCESSIVE.

 A. THE COURT ERRED IN FINDING THAT A PELLET GUN MET THE DEFINITION OF A FIREARM WITHIN THE MEANING OF *N.J.S.A.* 2C:39–1F, WARRANTING THE IMPOSITION OF A MANDATORY TERM OF IMPRISONMENT UNDER THE *GRAVES* ACT.

 B. THE COURT ERRED IN FINDING THAT DEFENDANT'S 1987 CONVICTION FOR ARMED ROBBERY QUALIFIED HIM AS A SECOND *GRAVES* ACT OFFENDER WHICH WARRANTED THE IMPOSITION OF AN EXTENDED TERM.

Defendant Brooks raises the following contentions:

POINT I. THE JUDGE ERRED IN HOLDING THAT DEFENSE COUNSEL COULD NOT QUESTION WILLIAM NELSON BEFORE THE JURY ON THE SUBJECT OF HIS DRUG USE.

POINT II. THE TRIAL COURT'S DEFINITION OF CONSTRUCTIVE POSSESSION WAS INCORRECT AND CONFUSING AND DEFENDANT'S CONVICTIONS FOR POSSESSORY OFFENSES MUST BE REVERSED AND THE MATTER REMANDED FOR A NEW TRIAL. (Not Raised Below).

POINT III. DEFENDANT'S CONVICTION FOR POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE IS PATENTLY INCONSISTENT WITH HIS ACQUITTAL OF ARMED ROBBERY AND THE CONVICTION MUST BE VACATED.

POINT IV. THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONCLUSION THAT THE CARBON DIOXIDE POWERED PELLET GUN WAS A FIREARM WITHIN THE MEANING OF THE STATUTE AND DEFENDANT'S CONVICTIONS FOR UNLAWFUL POSSESSION OF A WEAPON AND POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE MUST BE VACATED. (Not Raised Below).

POINT V. DEFENDANT'S CONVICTION FOR POSSESSION OF A FIREARM FOR AN UNLAWFUL PURPOSE MUST MERGE WITH HIS ROBBERY CONVICTION AND THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE.

We are convinced the limitation upon Nelson's drug use, raised in Wormley's point II, Eden's point IV and Brooks' point I, and the claim of juror taint raised in Eden's point II, require reversal, either separately or cumulatively. We therefore do not address the sentencing contentions, although we note our concern over the extended terms, raised in Wormley's point VII and Eden's point VB. As to the claims concerning Nelson's identification of Wormley and Eden raised in Wormley's and Eden's respective point I, we note only our concern that of the twelve photos shown to him, Nelson testified that he was familiar with eight or nine of the

people depicted. By virtue of the fact that he did not know the perpetrators, his selection was narrowed to three or four photos of individuals he did not know. He apparently guessed on two, one being Brooks, whom he never saw, and the other being someone concededly not involved at all.[5] We recognize that the trial judge concluded, after a *Wade* [6] hearing, that Nelson's identification was not the product of an impermissibly suggestive procedure, such that there was a substantial likelihood of misidentification. *Manson v. Brathwaite*, 432 *U.S.* 98, 114, 97 *S.Ct.* 2243, 2253, 53 *L.Ed.*2d 140 (1977); *Neil v. Biggers*, 409 *U.S.* 188, 93 *S.Ct.* 375, 34 *L.Ed.*2d 401 (1972); *State v. Madison*, 109 *N.J.* 223, 232–34, 536 *A.*2d 254 (1988). But only the line-up officer testified at the hearing. He denied being told by Nelson that he recognized almost all but the ones he picked out. That does not mean, however, that in fact, Nelson did not know the others. Apparently, he did. Ultimately, though, we suppose the issue was one for the jury. *State v. Carter*, 91 *N.J.* 86, 131, 449 *A.*2d 1280 (1982).

We add, also, that if there is a retrial, there is something to be said for the claims raised by Brooks and Eden as to the lack of any evidence to establish that the pellet gun could fire an object that was "smaller than three-eighths of an inch in diameter." *See N.J.S.A.* 2C:39–1f. Certainly there was no testimony to that effect. We are not sure we can say that the jury could draw that factual finding beyond a reasonable doubt by simply looking at the gun. In any event, we need not resolve this issue in light of our following discussion.

## III

All three of the defendants claim that the trial judge erred in not allowing them to inquire into the past drug use of William Nelson. At the *N.J.R.E.* 104(c) hearing to determine the admissi-

---

[5] Nelson explained that he was looking not so much at who was holding the guns, but at the guns themselves.

[6] *United States v. Wade*, 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967).

bility of his history of drug use, Nelson testified that from sometime in 1991, after his release from prison on a drug conviction sentence, through to April, 1994 he regularly used marijuana and heroin. However, he insisted that he did so only on the weekends because during the week he worked with children at Headstart, and that he "never indulged" during the week. He denied having used either drug on the day of the robbery, a Thursday, although he did admit smoking marijuana and sniffing heroin on the Saturday before but not on that Sunday because he was in church. Nelson also admitted that in May 1994 he sought counseling for his drug problem. And, in the January 17, 1990 judgment of conviction and sentence on two prior drug offenses, the sentencing judge noted that the convictions were Nelson's seventh and eighth convictions, "all a testament to" his "inability to rid himself of his drug addiction."

Nonetheless, the trial judge here concluded that Nelson was credible when he said he did not do drugs during the week because he had a responsibility to the children. "The manner and the way of his testifying clearly made his testimony most credible." Based upon this assessment of Nelson's credibility, the judge precluded any cross-examination of Nelson concerning his drug use. Defendants contend that Nelson's drug use was admissible as impeachment evidence pursuant to *N.J.R.E.* 607 and habit and custom evidence pursuant to *N.J.R.E.* 406(a).

We agree with the trial judge that the evidence of Nelson's drug use was probably insufficient to establish drug use on the day of the robbery under the habit and custom rule. *See State v. Franklin*, 52 *N.J.* 386, 399, 245 *A.*2d 356 (1968) (witness' history of chronic alcoholism insufficient to establish intoxication on the day of the offense as habit and custom). *Compare State v. Kately*, 270 *N.J.Super.* 356, 363, 637 *A.*2d 214 (App.Div.1994); *State v. Radziwil*, 235 *N.J.Super.* 557, 565–66, 563 *A.*2d 856 (App.Div.1989), *aff'd*, 121 *N.J.* 527, 582 *A.*2d 1003 (1990). *And see McCormick, Evidence*, § 195, 825–26 (Strong, 4th ed., 1992) (habit only becomes a habit sufficient to justify an inference of conduct on a particular

time when the habit is such that it is the person's "regular practice of responding to a particular kind of situation with a specific type of conduct.").

 The focus of defendants' cross-examination of Nelson's drug use was essentially for the purpose of impeachment. We consider the trial judge's ruling in the context of that focus. Trial judges are accorded broad discretion in determining the appropriate limits of cross-examination. *State v. McDougald,* 120 *N.J.* 523, 577–78, 577 *A.*2d 419 (1990). But we have repeatedly expressed our adherence to the critical, and constitutionally required, role of cross-examination in a criminal trial. As we said in *State v. Laboy,* 270 *N.J.Super.* 296, 303, 637 *A.*2d 184 (App.Div.1994):

> The primary interest advanced by the Confrontation Clause is the right of cross-examination. *Kentucky v. Stincer,* 482 *U.S.* 730, 736, 107 *S.Ct.* 2658, 2662, 96 *L.Ed.*2d 631, 641 (1987) (quoting *Douglas v. Alabama,* 380 *U.S.* 415, 418, 85 *S.Ct.* 1074, 1076, 13 *L.Ed.*2d 934, 937 (1965)). The opportunity for cross-examination has been characterized as the " 'greatest legal engine ever invented for the discovery of truth[,]' " *California v. Green,* 399 *U.S.* 149, 158, 90 *S.Ct.* 1930, 1935, 26 *L.Ed.*2d 489, 497 (1970) (quoting 5 *Wigmore on Evidence* § 1367 (3d ed.1940)), and is 'critical for ensuring the integrity of the fact-finding process[,]' *Kentucky v. Stincer,* 482 *U.S.* at 736, 107 *S.Ct.* at 2662, 96 *L.Ed.*2d at 641. Cross-examination affords the accused an opportunity to test the recollection and sift the conscience of the witness. *Mattox v. United States,* 156 *U.S.* 237, 242, 15 *S.Ct.* 337, 339, 39 *L.Ed.* 409, 411 (1895). It also compels the witness to stand face to face with the jury in order that it may observe him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. *Id.* at 242–43, 15 *S.Ct.* at 339, 39 *L.Ed.* at 411.

Furthermore, "the cross-examiner is not only permitted to delve into the witness' story to test [his] perception and memory, but has [also] been allowed to impeach, i.e., discredit, the witness." *Davis v. Alaska,* 415 *U.S.* 308, 316, 94 *S.Ct.* 1105, 1110, 39 *L.Ed.*2d 347, 353 (1974). It does not matter that the likelihood of defendant's contention "might be slim." *State v. Crudup,* 176 *N.J.Super.* 215, 221, 422 *A.*2d 790 (App.Div.1980). "The point to be stressed is that under our system, a defendant is entitled to fully test the State's proofs by challenging a witness's perceptions and his ability to make observations." *State v. Zenquis,* 251 *N.J.Super.* 358, 367, 598 *A.*2d 245 (App.Div.1991), *aff'd,* 131 *N.J.* 84, 618 *A.*2d 335 (1993).

Most assuredly, evidence of a witness' sensory or mental defects has "unquestionable" relevancy in attacking that witness' credibility. *State v. Johnson,* 216 *N.J.Super.* 588, 603, 524 *A.*2d 826 (App.Div.1987). Proof, then, that such a defect or abnormality existed at the time a witness claims to have made certain observations, is a significant impeachment tool. *Ibid. See State v. Franklin, supra,* 52 *N.J.* at 399, 245 *A.*2d 356.

Here, the *N.J.R.E* 104 hearing established that at the time of the alleged robbery, Nelson had had a longstanding addiction to drugs and, indeed, even after the incident, required drug treatment. We acknowledge that he denied that his faculties were affected while he was using the drugs and defendants presented no evidence to the contrary. But we think it not beyond the realm of a juror to conclude that one's ability to perceive and observe would be impaired to some extent. *Cf. State v. Johnson,* 42 *N.J.* 146, 166–67, 199 *A.*2d 809 (1964) ("it is well known . . . that alcohol has differing external effects on people, depending upon the personality of the person in question."). Moreover, we also recognize that Nelson denied using drugs during the weekdays, including the day of the alleged robbery, and further that the trial judge found him credible. But we are convinced that should have been the province of the jury here. *See State v. Franklin, supra,* 52 *N.J.* at 399, 245 *A.*2d 356.

Nelson's observations and conduct after the alleged robbery were, at best, questionable. And, some of the objective evidence was not as Nelson's testimony would have suggested it should be. For instance, not as many coats were found as he said were taken and, perhaps critically, one less gun was found in defendants' car. Tucker, who might be considered the more independent witness of the two, said that no coats or guns were thrown from defendants' vehicle as he was following it. In addition, the photo line-up identification by Nelson raises some question as to his capacity to make accurate observations at the time of the alleged robbery. Nelson said that he only saw two men during the alleged robbery. However, he picked out *three* pictures from the photo array, one

of whom he said he never saw (Brooks) and the other was not involved at all. He did not pick out the photo of Wormley, though he identified him in court as one of the two gun-toting robbers.

To be sure, defendants were able to cast some question upon Nelson's credibility through these peculiarities in his testimony and his prior convictions. But we are convinced that whereas the jury might have had some question as to his observations based upon all of that, cross-examination of his drug use may well have tipped the scales. That is to say, had the jury heard this evidence, we think it probable, at the very least as to the alleged involvement of the gun in addition to the theft, the verdicts would have been different.

## IV

At the lunch break on the first day of trial, after the State had presented Tucker's testimony, juror number seven asked to speak to the judge. Out of the presence of the other jurors, she admitted that she knew Nelson as a former co-worker. She stated that though she did not know Tucker personally, she had seen him "in the vicinity where it took place." Though the juror claimed to have not made the connection during *voir dire*, but only realized that she was familiar with the case during Tucker's testimony, she admitted that she knew "all about the chase," that she had "heard things" because she lived in the area. She said "I know the area. I know when it happened. I know what happened. Mr. Nelson approached me as an ex-employee and [spoke to her about it]." Nonetheless, and despite an extensive depiction of the circumstances and people involved during not only the jury selection process but opening statements, the juror said she erroneously believed that the William Nelson she knew lived out of state and that is why she had not mentioned this before.

The trial judge expressed concern about the juror's ability to continue to serve as an impartial juror and solicited suggestions from counsel. Counsel for defendant Brooks emphasized the need to "protect the integrity of the record" to ensure that nothing had been disclosed to the other jurors. The judge asked the juror if

she had revealed her knowledge to any other jurors in response to which she denied that she had discussed the case with anyone. She was then excused, no further inquiry was made of the other jurors and the jury was simply told that juror seven was excused for reasons that they did not have to know about.

We recognize that the trial judge was not asked to directly *voir dire* the remaining jurors as to whether juror seven had imparted any impermissible information. But we are convinced the judge's failure to do so to ensure that no prejudicial taint had occurred, constitutes plain error.

Once a hearing is conducted regarding possible outside influences on jurors, "[a] new trial will be granted where jury misconduct or intrusion of irregular influences into the jury deliberation 'could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge.'" *State v. Grant*, 254 *N.J.Super.* 571, 583, 604 A.2d 147 (App.Div.1992) (quoting *Panko v. Flintkote Co.*, 7 *N.J.* 55, 61, 80 A.2d 302 (1951)). The test is not whether the irregularity "actually influenced the result, but whether it had the capacity of doing so." *Ibid.* (quoting *Panko, supra,* at 61, 80 A.2d 302). Furthermore, it is presumed the irregularity had the capacity to influence, "unless it has affirmatively been shown [by the State that] it does not." *Id.* at 588, 604 A.2d 147 (citing *State v. Sachs,* 69 *N.J.Super.* 566, 588, 174 A.2d 605 (App.Div.1961)). "[T]his rule is not a mere formalism," but is "imperatively required to secure verdicts based on proofs taken openly at the trial free from all danger of extraneous influences." *Id.* at 583, 604 A.2d 147 (quoting *State v. Weiler*, 211 *N.J.Super.* 602, 610, 512 A.2d 531 (App. Div.), *certif. denied*, 107 *N.J.* 37, 526 A.2d 130 (1986)).

The juror's familiarity with Nelson and of the incident itself, as well as her familiarity with Tucker, was not only disqualifying, but potentially impermissibly tainting, whatever her views may have been. *See State v. Deatore*, 70 *N.J.* 100, 105–06, 358 A.2d 163 (1976); *State v. Jackson*, 43 *N.J.* 148, 160, 203 A.2d 1 (1964), *cert. denied sub nom., Ravenell v. New Jersey*, 379 *U.S.*

982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965). The other jurors, then, should have been *voir dired. See Current N.J. Court Rules,* comment 2 on *R.* 1:16–1 (1997) (where during the course of a trial circumstances arise that suggest jury taint "the trial court ... is obliged to interrogate the juror in the presence of counsel and to determine if there is a taint *and if so, if any other jurors have been infected thereby.*" (emphasis added)). *See e.g., State v. Bey,* 112 *N.J.* 45, 86–87, 548 *A.*2d 846 (1988); *State v. Scherzer,* 301 *N.J.Super.* 363, 487–88, 694 *A.*2d 196 (App.Div.1997); *State v. Jasuilewicz,* 205 *N.J.Super.* 558, 567–69, 501 *A.*2d 583 (App.Div. 1985), *certif. denied,* 103 *N.J.* 467, 511 *A.*2d 649 (1986).

Despite the juror's disclaimer as to having conveyed her knowledge to the other jurors, we think there was a strong likelihood that, even indirectly or unintentionally, she may well have. Before the juror disclosed her knowledge, the jury selection process, opening arguments, and testimony of a witness had occurred. There was at least one break during which the jurors commingled informally. Without the trial judge's inquiry of the remaining jurors, we can not be assured that juror seven did not convey, either directly or indirectly, her knowledge "all about the chase," "all about the case," and the "things she had heard."

Reversed.