NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-2368-15T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

DANIEL A. CATALANO,

 Defendant-Appellant.

_____________________________________

 Submitted May 4, 2017 – Decided July 6, 2017

 Before Judges Lihotz and O'Connor.

 On appeal from Superior Court of New Jersey,
 Law Division, Monmouth County, Indictment
 No. 15-02-0354.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Monique Moyse, Designated
 Counsel, on the brief).

 Christopher J. Gramiccioni, Monmouth County
 Prosecutor, attorney for respondent (Paul H.
 Heinzel, Assistant Prosecutor Senior
 Litigation Counsel, of counsel; Lisa Sarnoff
 Gochman, Legal Assistant, on the brief).

 Appellant filed a pro se supplemental brief.

PER CURIAM
 Defendant Daniel A. Catalano appeals from a December 8,

2015 judgment of conviction, entered after a jury trial. The

jury found defendant guilty of third-degree fraudulent use of a

credit card, N.J.S.A. 2C:21-6(h), and fourth-degree credit card

theft, N.J.S.A. 2C:21-6(c)(1). The court imposed a five-year

term of imprisonment for the former and an eighteen-month

concurrent term for the latter offense. We affirm.

 I

 The pertinent evidence is as follows. In July 2014,

defendant's father, the victim of the crime, testified his

credit rating had inexplicably dropped. He obtained a copy of

his credit report, which revealed charges had been placed on a

Capital One credit card that had been sent to him but never

activated. Concerned, he telephoned Capital One and learned the

card had been activated from his home, and charges were put on

his card from March to May 2014. At the time, his wife,

daughter, and defendant, who is his son, were living in his

home; all three denied using the card.

 The father contacted the local police department to report

the unauthorized use of his card. After conducting an

investigation, the police suspected defendant was the culprit.

Sergeant Paul Santucci testified six of the charges on the card

were money orders purchased through Western Union and sent to
 2
 A-2368-15T2
defendant, who picked up the money orders in various

municipalities in Monmouth County.

 According to Western Union's records, the name of the

ostensible "sender" - the term used by Western Union - was the

father's. However, Santucci discovered the cell phone number

used by the alleged sender to contact Western Union and arrange

for money orders to be charged to the Capital One account, and

then sent to defendant, in fact belonged to defendant. Santucci

located the cell phone number in defendant's name using a

database he accessed at the police station.

 One charge placed on the credit card in March 2014 was a

$272 payment toward services provided by Mark Melango, a bail

bondsman. Before addressing Melango's testimony, we discuss the

controversy over his anticipated testimony before trial, as well

as a comment made by a prospective juror during jury selection.

 Before trial, the assistant prosecutor brought to the

court's attention she wished to introduce evidence of a

transaction between Melango and defendant. At the time of that

transaction, defendant was in jail. Defendant contracted with

Melango to provide him with the bail necessary to get him out of

jail. The State proffered defendant used the subject charge

card to pay for Melango's services, and gave Melango his cell

 3
 A-2368-15T2
phone number, a number that matched the one used by the party

who sent money orders to defendant through Western Union.

 Although defendant allegedly used the credit card without

his father's permission to post bail, the State noted it was

not prosecuting defendant for the transaction involving Melango.

However, the State regarded defendant's transaction with Melango

as intrinsic to the offenses with which defendant was charged,

because this transaction revealed defendant was in possession of

and using the card around the same time charges were being

posted on the card for the money orders. Also, the cell phone

number defendant provided to Melango was the same cell phone

number used by the sender to purchase the money orders, showing

defendant sent the money orders to himself.

 Defendant objected to the introduction of any evidence of

defendant's interaction with Melango, arguing such evidence

revealed defendant had engaged in a prior bad act, specifically,

that he used the credit card in his father's name to pay for

Melango's service without his father's authorization. The court

stated it initially considered the admissibility of the evidence

under N.J.R.E. 404(b), but then determined the subject evidence

was not "other crimes" evidence, rendering unnecessary an

analysis under N.J.R.E. 404(b).

 4
 A-2368-15T2
 The court concluded the evidence arising out of defendant's

interaction with Melango was "intrinsic" to the charged crimes

and, because it was relevant and its prejudicial value not

substantially outweighed by the risk of causing undue prejudice,

see N.J.R.E. 403, the evidence was admissible. However, the

court granted defendant's request there could be no evidence

defendant had been in jail, or that Melango was a bail bondsman,

because of defendant's concern the identification of his

profession would suggest to the jury defendant used his services

to get out of jail.

 We turn to the controversy over a prospective juror's

comments during jury selection. The comments were made during

the following exchange between the court and the prospective

juror:

 THE COURT: Did you know anyone on the
 witness list?

 THE JUROR: Mr. Melango, is he a bail
 bondsman?

 THE COURT: He is from Neptune.

 THE JUROR: If he's a –

 THE COURT: You know him?

 THE JUROR: Yeah.

 THE COURT: Okay. Why don't we come to
 sidebar?

 5
 A-2368-15T2
 After the sidebar conference, the juror was excused by the

court. The sidebar conference was not recorded because the

voices were inaudible but, the following morning, the court

placed on the record defendant had asked for a mistrial on the

ground the juror's comments revealed Melango was a bail

bondsman; however, the court denied the motion.

 Defendant again asked for a mistrial when the parties

assembled for another day of jury selection, maintaining all of

the potential jurors sitting in the court room were tainted by

the juror's comments. The court offered but defendant decided

against giving a curative instruction; defendant was concerned

an instruction would only highlight what the juror said. The

court then denied defendant's second motion for a mistrial,

providing the following reasons.

 First, the court noted the juror's comments were not

damaging because

 bail is just something under our court rules
 that people post when they are accused of a
 crime. . . . [T]here is no negative
 inference they should draw as to his guilt
 because he has been accused of a crime. We
 take great pains during our initial
 instructions to indicate the indictment is
 not evidence. . . . So I don't think under
 any situation that what was blurted out by
 the potential juror is grounds for a
 mistrial. I don't believe it prejudices the
 defendant to that extent. That's number
 one.
 6
 A-2368-15T2
 The court then observed if the case were not tried at that

time, given the shortage of judges and the backlog of criminal

cases, defendant's matter might not be scheduled for trial again

for another ten months. The court stated it squeezed

defendant's case in for trial because defendant was in jail, but

"if [defendant] says . . . I'll wait [ten months] to go to

trial, I'll sit in jail happily, well, then, that's another

consideration I'll have to make but I haven't heard that. . . .

[But] I think the defendant is entitled to a speedy trial. I

don't feel he's been prejudiced by what's been said."

 Returning to our summary of the pertinent evidence adduced

during trial, Melango's testimony was consistent with the

State's proffer. Through his testimony, it was established

defendant used the subject credit card in payment toward

Melango's services, and provided the incriminating cell phone

number to Melango. In addition, Melango testified that,

although he initially dealt with defendant over the phone,

defendant did come into his place of business to sign the credit

card receipt. At that time, Melango took a picture of

defendant. That picture was placed into evidence to provide

proof defendant was the person with whom Melango did business.

 7
 A-2368-15T2
 Despite having a photograph to prove it was defendant with

whom Melango interacted, the assistant prosecutor asked Melango

if he could make an in-court identification of defendant. That

exchange was as follows:

 PROSECUTOR: And do you see Daniel
 Catalano in the courtroom here today?

 MELANGO: Do I?

 PROSECUTOR: Yes.

 MELANGO: No. It might be him right
 now but he looks different.

 THE COURT: I'm sorry?

 MELANGO: Looks like him right there.

 On cross-examination, defense counsel asked Melango the

following: "Daniel Catalano was not physically in your place of

business when this transaction began. Right?" Melango

replied, "No. He was in jail." The court immediately delivered

the following instruction to the jury:

 Ladies and gentlemen, whether or not he was
 in jail at the time of this offense or this
 incident here is of no moment. He's not
 charged with anything dealing with this
 particular incident. And if he was or not
 in jail, again, reflects in no way on his
 guilt or innocence in this matter. Okay. So
 you are to disregard that response.

 Again, the response was solicited through
 the defense question. I'm sure [defense
 counsel] didn't intend that to be the
 response. It was the response. But you are
 8
 A-2368-15T2
 to totally disregard it, and not, it should
 not enter into your deliberations in any
 way, shape, or form.

 In addition, I was going to give you this
 instruction when the witness was finished
 but I'll give it to you now.

 As you know, and will recall, when I read
 the indictment to you, it mentioned
 allegations involving Colts Neck, Marlboro,
 and Middletown.

 During this testimony you've heard that Mr.
 Melango's place of business is Neptune.
 [Defendant] is not charged with anything to
 do with the executing of this agreement or
 whatever occurred with Mr. Melango in
 Neptune. He's not charged in that by way of
 the indictment.

 This information was only presented to you
 intrinsically so the State could attempt to
 prove to you that Mr. Catalano had used a
 credit card which they are trying to match
 up to the credit card that was allegedly
 used in Colts Neck, Marlboro, and/or
 Middletown. So that was the only purpose it
 was presented.

 So again whether or not he was in jail at
 the time that his transaction occurred, this
 transaction itself, you are not to consider
 them in any way, shape, or form as to
 whether or not he's a bad person or he was
 guilty of the items that have been testified
 to previously in which the State is alleging
 occurred in other municipalities, Colts
 Neck, Marlboro, and Middletown between March
 20th, 2014 and May 5, 2014.

When delivering the final jury charge, the court stated:

 Now, as I said to you during the testimony
 of the State's witness, Mark Melango, and as
 9
 A-2368-15T2
 noted in the indictment, Mr. Catalano is
 charged in Counts 1 and 2 with events
 allegedly occurring in Colts Neck, Marlboro,
 and Middletown. The incident testified to
 by Mr. Melango that allegedly occurred in
 Neptune in March 2014 is not part of the
 indictment. You are not to speculate why,
 if at all, Mr. Catalano may have engaged the
 services of Mr. Melango. Any speculation as
 to whether this defendant has other troubles
 he was dealing with during this time period
 is just that, speculation, and should not
 enter your deliberations.

 This testimony was only allowed as intrinsic
 evidence to aid the State in their attempt
 to show Daniel Catalano had access to the
 Capital One credit card and had the ability
 to use it, utilize it, at the times and
 locations noted in the indictment.

 You are not to utilize this testimony for
 any other purpose other than what I have
 instructed you.

 As previously stated, the jury convicted defendant of the

two charges with which he had been indicted.

 II

 On appeal, defendant asserts the following arguments:

 POINT I – THE TRIAL COURT DEPRIVED MR.
 CATALANO OF HIS RIGHTS TO DUE PROCESS AND A
 FAIR TRIAL AND ABUSED ITS DISCRETION BY
 FAILING TO DISMISS THE JURY PANEL.

 POINT II – THE ADMISSION OF EVIDENCE OF MR.
 CATALANO'S ALLEGED UNCHARGED TRANSACTION IN
 NEPTUNE, NEW JERSEY, WITH MARK MELANGO
 VIOLATED HIS RIGHT TO A FAIR TRIAL.

 POINT III – THE TRIAL COURT'S JURY CHARGE ON
 IDENTIFICATION WAS INADEQUATE AND
 10
 A-2368-15T2
 INCOMPLETE, DEPRIVING MR. CATALANO OF HIS
 RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

 POINT IV – THE TRIAL COURT COMMITTED
 REVERSIBLE ERROR BY ADMITTING INTO EVIDENCE
 HEARSAY FROM A POLICE DATABASE.

 POINT V – THE TRIAL COURT ABUSED ITS
 DISCRETION BY IMPOSING A MANIFESTLY
 EXCESSIVE SENTENCE.

 Defendant raised the following arguments in a supplemental

pro se brief:

 POINT I – THE COURT COMMITTED REVERSIBLE
 ERROR BY ALLOWING EVIDENCE OF UNCHARGED
 CRIMES TO BE ADMITTED WITHOUT A LIMITING
 INSTRUCTION OR HEARING.

 POINT II – THE CONVICTION MUST BE REVERSED
 DUE TO THE COURT'S REFUSAL TO SUBMIT
 TERRITORIAL JURISDICTION AS AN ELEMENT OF
 THE OFFENSE TO BE DECIDED BY THE JUDGE.

 POINT III – THE ADMISSION OF EVIDENCE OF A
 CRIME; THE GRAND JURY SAW, AND DECLINED TO
 INDICT VIOLATED DEFENDANT'S RIGHT TO A FAIR
 TRIAL.

 POINT IV – IT IS UNKNOWN IF THE JURY WAS
 UNANIMOUS; DUE TO A STRUCTURAL ERROR IN THE
 JURY CHARGES.

 POINT V – REPEATED INSTANCES OF
 PROSECUTORIAL MISCONDUCT DENIED THE
 DEFENDANT'S RIGHT TO A FAIR TRIAL.

 We have reviewed the arguments in light of the record and

applicable law. We are not persuaded.

 A

 11
 A-2368-15T2
 Defendant contends he was denied his right to a fair trial

when the trial court failed to dismiss the jury panel and

declare a mistrial after the prospective juror asked the court

if Melango were a bail bondsman, followed by her statement she

knew him. Defendant argues the juror's comment was tantamount

to confirming, in the presence of the full jury panel, Melango

was in fact a bail bondsman.

 "A defendant's right to be tried before an impartial jury

is one of the most basic guarantees of a fair trial." State v.

Loftin, 191 N.J. 172, 187 (2007). That right "includes the

right to have the jury decide the case based solely on the

evidence presented at trial, free from the taint of outside

influences and extraneous matters." State v. R.D., 169 N.J.

551, 557 (2001). However, even if the court determines a jury

"has been exposed to [an] outside influence," a "new trial . . .

is not necessary in every instance." Id. at 559. "Ultimately,

the trial court is in the best position to determine whether the

jury has been tainted. That determination requires the trial

court to consider the gravity of the extraneous information in

relation to the case, and the overall impact of the matter on

the fairness of the proceedings." Ibid.

 "We traditionally have accorded trial courts deference in

exercising control over matters pertaining to the jury." Id. at
 12
 A-2368-15T2
559-60. We review the disposition of a motion for a mistrial

for an abuse of discretion. Id. at 559. "Application of that

standard respects the trial court's unique perspective." Ibid.

 "[T]he test for determining whether a new trial will be

granted because [of] . . . the intrusion of irregular

influences is whether such matters could have a tendency to

influence the jury in arriving at its verdict in a manner

inconsistent with the legal proofs." State v. Jenkins, 182 N.J.

112, 131 (2004) (quoting Panko v. Flintkote Co., 7 N.J. 55, 61

(1951)). Thus, a new trial is required where the irregularity

has the capacity to influence the outcome of the trial; a

showing of actual prejudice is not required. See R.D., supra,

169 N.J. at 558. Moreover, "it is presumed the irregularity had

the capacity to influence, 'unless it has affirmatively been

shown [by the State that] it does not.'" State v. Wormley, 305

N.J. Super. 57, 69 (App. Div. 1997) (alteration in original)

(quoting State v. Grant, 254 N.J. Super. 571, 588 (App. Div.

1992)), certif. denied, 154 N.J. 607 (1998)).

 Applying these principles, we are unconvinced defendant was

prejudiced by the juror's comments, and conclude the trial court

did not abuse its discretion in denying his motion for a

mistrial and the convening of a new jury pool. The mere mention

one of the witnesses was a bail bondsman did not have a tendency
 13
 A-2368-15T2
to influence the jury in arriving at its verdict in a manner

inconsistent with the evidence. Even if the jury surmised

defendant contracted with Melango to obtain bail, as stated by

the trial court, there is no negative inference to be drawn

simply because one has been accused of a crime, a point stressed

in the court's initial instructions to the jury when it

emphasized the indictment was not evidence of defendant's guilt

of the charges.

 In addition, when Melango testified defendant was in jail

the first time he communicated with him, the court delivered a

prompt and forceful curative instruction to ameliorate the

effect of Melango's comment, and jurors are presumed to follow a

court's instructions. See State v. Martini, 187 N.J. 469, 477

(2006), cert. denied, 549 U.S. 1223, 127 S. Ct. 1285, 167 L. Ed.

2d 104 (2007).

 Among other things, the court instructed the jury to

disregard Melango's testimony, that such testimony was not to

enter into its deliberations in "any way, shape, or form." The

court also pointed out that whether defendant was or was not in

jail did not reflect upon his guilt or innocence in the matter

before the jury. Of course, this instruction equally applied to

any assumption Melango was a bail bondsman. That is, defendant

was not concerned Melango was a bail bondsman per se. Defendant
 14
 A-2368-15T2
was concerned his association with a bail bondsman would suggest

he contacted Melango because he was in jail.

 Accordingly, we are satisfied the juror's remarks could not

have influenced the outcome in this matter. Even if the remarks

had such a tendency, the court's strong curative instruction

appropriately guided the jury from using such evidence during

its deliberations.

 B

 Defendant contends evidence of his unauthorized use of the

credit card in his transaction with Melango was a prior bad act

that negatively tainted the jury's impression of him, violating

his right to a fair trial and requiring the reversal of his

convictions. Defendant's argument warrants little discussion.

Evidence of defendant's interaction with Melango was "intrinsic"

to the charged crimes and admissible.

 "[E]vidence is intrinsic if it 'directly proves' the

charged offense." State v. Rose, 206 N.J. 141, 180 (2011)

(quoting United States v. Green, 617 F.3d 233, 248 (3d Cir.

2010)). In Rose, the Court instructed the "threshold

determination under [N.J.R.E.] 404(b) is whether the evidence

relates to 'other crimes,' and thus is subject to continued

analysis under [N.J.R.E.] 404(b), or whether it is evidence

intrinsic to the charged crime, and thus need only satisfy the
 15
 A-2368-15T2
evidence rules relating to relevancy, most importantly

[N.J.R.E.] 403." Id. at 179.

 Here, the court found the evidence intrinsic, relevant, and

its probative value not substantially outweighed by the risk of

undue prejudice. The challenged testimony was admissible

because it related directly, and was intrinsic to, the crimes

for which defendant was being tried. The father testified he

never used the Capital One card; in fact, he claimed he had

never even activated the card. The transaction with Melango

exposed the fact defendant was in possession of and using the

card during the time period the unauthorized charges were placed

on the card.

 The transaction also confirmed defendant's cell phone

number, enabling the State to tie defendant to the Western Union

charges placed on the card. Additionally, the photograph taken

at the time defendant signed a contract with Melango challenged

the asserted mistaken identity defense and claim a third party

was placing the unauthorized charges on the card. We see no

error in the introduction of the challenged evidence.

 Moreover, the court properly instructed the jury on the

limited use of this evidence. "In setting forth the prohibited

and permitted purposes of the evidence the trial court must

include within the instruction 'sufficient reference to the
 16
 A-2368-15T2
factual context of the case to enable the jury to comprehend and

appreciate the fine distinction to which it is required to

adhere.'" State v. Hernandez, 170 N.J. 106, 131 (2001) (quoting

State v. Stevens, 115 N.J. 289, 304 (1989)). The court

emphasized the evidence of defendant's interactions with Melango

was introduced for a specific, narrow purpose. The court

informed the jury the evidence was only allowed as intrinsic

evidence to aid the State in its attempt to show, among other

things, defendant had access to and the ability to use the

Capital One credit card. The jury was further instructed it

could not utilize Melango's testimony for any purpose other than

what the court directed.

 C

 Defendant maintains the crux of the State's case was

whether he was the one who placed the unauthorized charges on

the credit card in his father's name and, thus, the case turns

on Melango's identification of defendant. The State concedes

Melango's in-court identification of defendant was equivocal,

but notes it did not rely upon this identification to establish

defendant was the individual with whom Melango interacted. In

addition to Melango's testimony that the person with whom he

dealt indentified himself as Daniel Catalano and affixed his

signature to their contract and the credit card receipt, the
 17
 A-2368-15T2
State relied upon the photograph Melango took of defendant when

defendant appeared in his office. That photograph was put into

evidence, allowing the jury to decide if the person in the

picture was defendant.

 For the first time on appeal, defendant argues the trial

court failed to properly instruct the jury on how to evaluate

the identification evidence offered by Melango. Although the

court did provide an instruction on identification, defendant

claims the court erred because it did not issue to the jurors

Model Jury Charge (Criminal), "Identification: In-Court and Out-

of-Court Identifications" (2012).1 For simplicity and for the

purpose of this opinion only, we refer to this charge as the

MJC.

 In our view, the MJC would not have been at all suitable

for this case. The MJC was implemented in light of the Supreme

Court's decision in State v. Henderson, 208 N.J. 208 (2011).

In Henderson, a defendant challenged an identification on the

ground police officers had unduly influenced the eyewitness.

Id. at 217. The eyewitness initially expressed doubt about the

identity of the perpetrator, but was able to confidently

identify the defendant after meeting with investigators. Id. at

1
 Because of the length of this charge, we do not reproduce it
here.
 18
 A-2368-15T2
223-24. The Court identified numerous factors that can affect

the ability of a witness to remember and identify perpetrators

of crimes, resulting in misidentifications, and ordered an

amplified, comprehensive jury charge. Id. at 298-99. The MJC

was then drafted and adopted by the Court.

 In the MJC, the court instructs the jury to consider the

eyewitness's attentiveness and opportunity to view the

perpetrator, as well as the following factors: the witness's

stress, the duration of observations, focus on weapons,

distance, lighting, intoxication, and disguises or changed

appearance. See Model Jury Charge (Criminal), supra, at 3-5.

The jury is also instructed about the potential impact of the

witness's prior description of the person identified, the

witness's confidence and accuracy, the time that elapsed between

the event and the identification, cross-racial effects, and the

impact of other's opinions. Id. at 5.

 Here, such factors have nothing to do with a jury's

examination of a photograph to determine whether it depicts the

person identified in court as defendant. Memory is not in

issue. See Henderson, supra, 208 N.J. at 245-76. Nor is there

a need to explain to the jury how the memory works. See id. at

273-74. A jury reviewing a photograph is not under stress;

 19
 A-2368-15T2
distracted by weapons; or hampered by shortness of time,

distance, and poor lighting.

 Here, the jury was capable of assessing the evidence

without the instructions contained within the MJC. The jury's

in-court comparison of the photograph to defendant was not an

identification procedure subject to Henderson. We therefore

conclude the omission of such an instruction was not "clearly

capable of producing an unjust result." R. 2:10-2.

 D

 Defendant next contends the trial court committed

reversible error by admitting into evidence hearsay from the

police database. Specifically, defendant argues it was error to

permit Santucci to testify the database set forth defendant's

cell phone number. The State concedes the evidence was

inadmissible hearsay, but notes evidence of defendant's cell

phone number was also supplied by Melango, who testified

defendant told him his cell phone number.

 We are satisfied the error was, beyond a reasonable doubt,

harmless, because the evidence from the database was merely

cumulative to evidence that was properly admitted and did not

affect the outcome. See State v. Carter, 91 N.J. 86, 114

(1982).

 20
 A-2368-15T2
 We have carefully examined defendant's remaining arguments

and conclude they are without sufficient merit to warrant

discussion in a written opinion. R. 2:11-3(e)(2).

 Affirmed.

 21
 A-2368-15T2